UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRANDON ELSASSER, SETH RUBIN, and COLLINS BROWN, | ) ) ) |
| Plaintiffs, | ) ) Case No. |
| vs. | ) ) ) |
| DV TRADING, LLC, | ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiffs Brandon Elsasser, Seth Rubin, and Collins Brown, for their Complaint against Defendant DV Trading, LLC, allege the following:

## NATURE OF THE ACTION

1. Plaintiffs bring this lawsuit against Defendant DV Trading, LLC ("DV") seeking a Declaratory Judgment that they have no obligation to pay any portion of a $5,000,000 fine that, upon information and belief, DV agreed to pay the U.S. Commodity Futures Trading Commission ("CFTC") for unlawful wash trading at DV as well as any other fine levied by any other regulator or exchange for the same conduct. Plaintiffs also seek damages resulting from DV's numerous violations of the Commodities Exchange Act ("CEA")

2. After a two-year investigation of DV, the CFTC concluded that DV engaged in illegal wash-trading strategies. Upon information and belief, based on these conclusions, the CFTC imposed a $5,000,000 fine against DV—not Plaintiffs—that DV agreed to pay as part of a settlement and in lieu of defending against a formal CFTC enforcement action.

3. Plaintiffs are former DV traders, two of whom were questioned in the CFTC's investigation and chose to cooperate with the CFTC and agreed to testify against DV in the event

of a formal enforcement action. The CFTC has determined that one of these traders should pay no fine, and the other should pay a $200,000 fine. Nonetheless, DV demanded that Plaintiffs pay all or a substantial portion of DV's $5,000,000 fine and associated legal expenses. By seeking recovery of its fine from Plaintiffs, DV attempts to punish Plaintiffs for cooperating with the government by overriding the CFTC's judgment as to whom it fines for violations of federal law. Plaintiffs seek a declaratory judgment that they are not responsible for paying DV's fine or legal expenses. Plaintiffs also seek money damages for injuries suffered as a result of DV's CEA violations.

## PARTIES AND RELATED ENTITIES

4. Plaintiffs Brandon Elsasser ("Elsasser") and Seth Rubin ("Rubin") are citizens of Illinois and Plaintiff Collins Brown ("Brown") is a citizen of Colorado. Plaintiffs trade futures and other products, including at the Chicago Mercantile Exchange ("CME"), which is operated by CME Group Inc. ("CME Group").

5. DV, a limited liability company organized under the laws of Illinois, is a proprietary trading firm with its headquarters and largest office located in Chicago, Illinois. DV was known as Rosenthal Collins Capital Markets LLC ("RCCM") from February 2013 to December 2015 and was known as Rosenthal Global Securities, LLC ("RGS") before that.[1]

6. DV was owned by a parent company, RCG Holdings, LLC ("RCG Holdings"), until September 1, 2016, when RCG Holdings spun off DV by transferring all of its ownership

---

[1] For clarity, Plaintiffs will refer to this entity as DV Trading, LLC ("DV") throughout this Complaint, although the name of this entity, and thus the name of Plaintiffs' employer, was Rosenthal Global Securities, LLC until February 2013, Rosenthal Collins Capital Markets LLC from February 2013 to December 2015, and DV Trading, LLC from December 2015 through their resignations in August 2016.

- 3 -

interests in DV to DV Group, LLC ("DV Group"), a limited liability company organized under Delaware law.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over DV because it is a company organized under the laws of Illinois with significant contacts with Illinois, including having its headquarters and substantial operations located in Chicago, Illinois.

8. This Court has subject-matter jurisdiction pursuant to (i) 28 U.S.C. § 1331 because Plaintiffs' claim for declaratory judgment raises a question of federal law, namely, whether Plaintiffs can be held legally responsible for a fine imposed upon DV by the CFTC based upon the CFTC's conclusion that DV violated federal law, and (ii) 7 U.S.C. §§ 26(h) & 25(c) which, respectively, grant U.S. District Courts jurisdiction over whistleblower retaliation claims under the CEA and exclusive jurisdiction over other private causes of action for CEA violations.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because: (i) DV resides in the judicial district in which this Court sits, and (ii) a substantial part of the events and omissions giving rise to Plaintiffs' claims against DV occurred in this judicial district, including Plaintiffs' retention by and work for DV as traders, DV's unlawful wash trading, the CFTC's investigation of DV, Plaintiffs' actions in cooperation with the CFTC, and DV's acts in retaliation against Plaintiffs due to their cooperation with the CFTC.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### *Plaintiffs Worked as Traders for DV*

10. Elsasser and Brown began working as traders for DV in 2010, and Rubin began working as a trader for DV in 2011.

11. As DV traders, each Plaintiff held funds in an account at RCG Holdings, which they used to fund their trading activities.

12. After they began working for DV, Plaintiffs traded exclusively for DV until on or about August 29, 2016, when each resigned from his position as a trader at DV.

13. In connection with their resignations from DV, Plaintiffs requested to withdraw the funds they held in their RCG Holdings capital accounts, which at the time of withdrawal collectively totaled approximately $1,600,000.

*CFTC Investigates DV for Unlawful Wash Trading*

14. The CFTC is an independent agency of the federal government that regulates futures markets and enforces the CEA.

15. In 2014, the CFTC opened an investigation into unlawful wash trading at DV.

16. As described in *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999), "[a] wash trade is a transaction made without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position."

17. Wash trades are prohibited by federal law under section 4c of the CEA, codified at 7 U.S.C. § 6c, because they are made for illegitimate reasons and because they undermine the core purpose of exchanges—efficiently establishing accurate prices for futures contracts.

18. The CFTC's investigation of DV centered on DV's participation in CME Group's Eurodollar Pack and Bundle Market Maker Program ("Eurodollar Program"), which incentivizes trading firms to trade in Eurodollar "pack" and "bundle" products by providing the firms with exchange fee rebates based on volume traded in the Eurodollar Program if they maintained certain quoting obligations.

19. At all times relevant to the allegations in this Complaint, DV was managed by Partner A and Partner B. Partner A resides in Toronto, and Partner B resides in Illinois.

20. On information and belief, Partner A and Partner B disproportionately benefited from DV's participation in the Eurodollar Program by keeping for themselves the vast majority of the eligible volume credits earned by all DV traders.

21. Partner A and Partner B sought to have DV trade enough in the Eurodollar Program to generate rebates for the entire firm's trading. Elsasser made Partner B aware of the Eurodollar program in 2010. Together they created and submitted a proposal, which got DV accepted into the Eurodollar Program. However, during this same period and up until Plaintiffs' resignations, DV indicated to Plaintiffs on numerous occasions that they were not generating or trying to generate rebates for the entire firm's volume.

22. Rather than make DV traders aware of this program or distribute rebates based on the proportion of trades, Partner A and Partner B kept these rebates for themselves. For example, upon information and belief, in June 2014, Partner A collected $23,492.06 in rebates, Partner B collected $25,640.31 in rebates, and DV's pack and bundle house account collected $238,029.87 in rebates from this program. The rebates allocated to the pack and bundle house accounts were from traders within DV who were not aware of or enrolled in the Eurodollar Program.

23. Elsasser, Rubin, and a junior trader employed by DV ("Trader A") were among the DV traders that traded in the Eurodollar pack and bundle products as part of DV's participation in the Eurodollar Program.

24. As part of their management roles at DV, Partner A and Partner B supervised and were aware of the trading practices and strategies of the individual DV traders that traded Eurodollar pack and bundle products as part of DV's participation in the Eurodollar Program.

25. Unlike Partner A and Partner B, Plaintiffs did not have a management role at DV and were generally unaware of other DV traders' activities trading as part of DV's participation in the Eurodollar Program.

26. Trader A—who is not a party to this suit—was a DV salaried employee who worked directly on Partner A's trading desk.

27. In January 2014, Partner A emailed Trader A directing him to "ramp up volume as much as possible for [r]est of the month."

28. The CFTC also became aware of email communications between Partner B and Partner A in which they disparaged Trader A's competence as a trader and suggested they were directing Trader A to trade in the Eurodollar pack and bundle products simply to boost volume for the Eurodollar Program.

29. Additionally, upon information and belief, Trader A told CME Group investigators that Partner A directed him to trade in the manner outlined below.

30. The CFTC investigation of DV centered on a series of three trading patterns. The CFTC ultimately concluded that DV was responsible for a culture of wash trading fostered by DV management.

31. The first trading pattern involved Trader A trading with himself—acting as both the buyer and the seller on a given trade—in 2013 ("First Pattern").

32. The First Pattern escaped the detection of DV's "wash-blocking" software because Trader A carried out one side of the trades using manual, point-and-click software located on his desktop computer, but carried out the other side of the trades using algorithmic, "autospreader" software co-located on a CME server.

33. CME Group noticed self-matched trades made by Trader A in February 2013, and sent an inquiry to DV about the suspect trades on March 27, 2013.

34. Despite CME Group's inquiry, Trader A continued to carry out the First Pattern or similar behavior as late as September 2013 while under Partner A's direction and supervision. Upon information and belief, Trader A's self-match activity actually increased after the CME Group's inquiry. Upon information and belief, Trader A's self-match activity comprised 4.2% of his volume and 4.9% of his trades in Eurodollars in February 2013 and increased to 5.5% of his volume and 6.9% of trades in Eurodollars in September 2013. Trader A's self-match volume increased 17% and self-match trades increased 41%.

35. Upon information and belief, the CFTC concluded that Trader A knew he was trading with himself because it is nearly impossible for a trader to inadvertently cross himself and because the other evidence produced in the case suggested that Trader A knew he was trading with himself.

36. Upon information and belief, Trader A is still employed by DV.

37. The second trading pattern involved trades made between Trader A and Rubin in February 2014 ("Second Pattern").

38. Trader A and Rubin made a number of trades with each other over a period of time both on February 13, 2014, and February 19, 2014.

39. Although Trader A and Rubin were trading anonymously, the CFTC concluded that these trades that were not *bona fide* trades. However, Rubin did not know that he was trading with Trader A, and from the information available to Rubin, there was no way he could have known he was trading with someone within the same firm.

40. Upon information and belief, Partner A and Partner B were the only people at DV who had firmwide visibility and responsibility to address trading within the firm. Accordingly, Partner A and Partner B knew or should have known that Trader A and Rubin were trading against each other, even though Rubin was not aware of this fact.

41. Upon information and belief, Partner A and Partner B had an incentive to not inform Trader A and Rubin they were trading against each other in order to collect the rebates from those trades.

42. In February 2014, shortly after these Second Pattern trades, CME Group took notice of these trades and disallowed any credits for the Eurodollar Program based on trades executed between two trader identification numbers (referred to as "Tag 50s") from within DV. This was the first time Rubin became aware that he was trading with a counter party within DV.

43. Soon after the CME investigation and disallowed trades made Rubin aware of these trades, the frequency of these trades dropped dramatically.

44. The third trading pattern involved a trading approach created by Elsasser in 2014 and 2015 ("Third Pattern").

45. The Third Pattern utilized the fact that combination products—in which multiple Eurodollar futures are grouped together into new products—can be placed onto the market by a trader or can be "implied" by proprietary software employed by CME Group.

46. Elsasser created an approach that accounted for the fact that when he placed orders to buy or sell certain pairs of products, CME Group's software automatically would create a new combination product that consisted of both products in the original pair.

47. Elsasser believed that he had created a new trading approach that did not run afoul of the ban on wash trading and therefore explained the Third Pattern in detail to Partner B.

48. Partner B did not instruct Elsasser to not use this trading approach and instead indicated that he did not disapprove of the Third Pattern.

49. Out of an abundance of caution, Elsasser asked Partner B if they should seek a legal opinion from counsel about the Third Pattern, but Partner B told Elsasser that seeking legal advice would not be helpful.

50. Unbeknownst to Elsasser and the other Plaintiffs, Partner B privately believed that the Third Pattern constituted illegal wash trading and he in fact described the Third Pattern as a "wash" strategy in internal DV documents.

51. Despite Partner B's belief that the Third Pattern constituted illegal wash trading, he encouraged Elsasser to continue the Third Pattern.

### *CFTC Concludes that DV Is Responsible for Unlawful Wash Trades*

52. Based on its investigation of the First, Second, and Third Patterns, the CFTC concluded that a culture of wash trading existed at DV starting as early as 2013.

53. In or around October 2014, the CFTC's Division of Enforcement informed DV that it intended to file an enforcement action against DV for unlawful wash trading.

54. In response to the CFTC investigation, DV selected the same lawyers to represent DV, Plaintiffs, and Trader A. When Plaintiffs directly inquired as to whether they needed to retain separate counsel, they were told that they did not.

55. DV made efforts, including by selecting counsel for Plaintiffs that also represented DV, to keep Plaintiffs uninformed about the specific details of the CFTC's allegations against DV and the trading patterns that the CFTC was investigating. Plaintiffs were unaware and uninformed about the strategy decisions counsel made regarding the CFTC investigation.

56. Prior to a meeting with CFTC and CME Group personnel scheduled for August 18, 2016, Plaintiffs hired separate counsel in relation to the CFTC investigation due to concerns about DV's handling of the investigation.

57. On August 18, 2016, counsel for DV and separate counsel newly hired by Plaintiffs met with CFTC and CME Group personnel to discuss the CFTC's investigation and its intention to file an enforcement action against DV.

58. Plaintiffs were shocked and concerned to learn during this meeting that the CFTC concluded that DV deliberately fostered a culture of wash trading. In and around that same date, Plaintiffs learned that the CFTC believed DV was not cooperative and forthcoming in the CFTC's investigation. Plaintiffs wanted to fully cooperate with the CFTC investigation and no longer wished to be associated with DV.

59. Following the meeting on August 18, 2016, Plaintiffs agreed to cooperate with the CFTC in its investigation of DV and to testify in any enforcement action brought against DV.

60. Based on the pattern of unlawful conduct at DV and DV's lack of candor and cooperation during the CFTC's investigation, the CFTC informed DV that it would pursue an enforcement action unless DV agreed to pay a significant fine.

61. Upon information and belief, DV agreed to settle this matter with the CFTC by paying a $5,000,000 fine.

62. The CFTC also concluded that Elsasser is legally responsible for his participation in the Third Pattern, but should be fined only $200,000 based on his limited role and his cooperation with the CFTC's investigation.

63. Elsasser agreed to settle the potential claims against him with the CFTC in exchange for a payment of a $200,000.

64. The CFTC chose not to impose fines against Rubin, Brown, or Trader A.

### *Plaintiffs Leave DV Just Before DV Is Spun Off from RCG Holdings*

65. While the CFTC investigation and settlement process unfolded, DV's management also was in the process of negotiating the acquisition of DV from RCG Holdings ("DV Spinoff").

66. The DV Spinoff was consummated on September 1, 2016, by RCG Holdings transferring all ownership interests it had in DV to an entity controlled by Partner A and Partner B, DV Group.

67. Partner A and Partner B induced traders at DV to stay at the newly reorganized company following the DV Spinoff.

68. Based on conversations over the past two years and up until around Plaintiffs formally resigned from DV, Partner A and Partner B intended to offer Plaintiffs partnerships in the newly formed DV Group of 3-5% to be split by Plaintiffs. Upon information and belief, prior to this time no traders were partners in DV other than Partner A and Partner B, and very few others would be given this opportunity.

69. Partner A and Partner B also wanted Plaintiffs to continue trading at DV Group and pay some portion of the fine the CFTC imposed on DV.

70. Plaintiffs each declined to execute the paperwork necessary to join DV following the DV Spinoff based on a reasonable belief that (i) their cooperation with the CFTC's investigation of DV, including testifying against DV, would result in retaliation by DV's management, and (ii) DV's management would attempt to force Plaintiffs to pay for DV's CFTC fine and/or legal expenses incurred in defending itself against a CFTC enforcement action.

71. On or about August 29, 2016, three days before the DV Spinoff, Plaintiffs each resigned from their positions as traders at DV.

72. Since resigning from DV, Plaintiffs have continued trading with another firm.

73. Following Plaintiffs' resignation from DV, RCG Holdings provided Plaintiffs with a release of claims related to the CFTC investigation.

### *DV Retaliation Against Plaintiffs for Cooperation with CFTC*

74. DV has retaliated against Plaintiffs based on their decisions to cooperate with the CFTC's investigation and to leave DV and trade elsewhere.

75. First, DV claimed that Plaintiffs are liable for all, or a substantial portion of, its $5,000,000 CFTC fine and its related legal expenses. At times, DV has claimed Plaintiffs are liable for DV's fine pursuant to an alleged and unidentified oral agreement. At other times, DV has claimed that the fine imposed by the CFTC for DV's unlawful activity is a normal trading loss or expense, and thus should be allocated based on what DV has described as the "Standard Allocation" between the Parties. DV has also claimed at times that these fines for DV's illegal activity should be charged 100% to Plaintiffs' capital accounts.

76. Second, DV attempted to stop RCG Holdings from distributing to Plaintiffs the roughly $1,600,000 that remained in their RCG Holdings trading accounts when Plaintiffs disassociated from DV by filing the aforementioned arbitration against RCG Holdings in October 2016.

77. In an arbitration claim DV filed against RCG Holdings, DV also named Plaintiffs as respondents and claimed that Plaintiffs were responsible for paying DV's CFTC fine.

78. DV withdrew this arbitration before either RCG Holdings or Plaintiffs responded in the arbitration.

79. Third, in correspondence from counsel dated October 26, 2016, DV threatened that if Plaintiffs filed suit against DV to seek relief from its demands, it would sue Plaintiffs for defamation, tortious interference, and other causes of action and seek sanctions against Plaintiffs and their lawyers in retaliation.

80. Fourth, after Plaintiffs resigned, DV hired certain persons—including one of Plaintiffs' lead developers—away from Plaintiffs by increasing compensation. This also resulted in a trader with considerable potential revenue staying at DV.

81. Fifth, DV failed to uphold its agreement to pay Plaintiffs $500,000 in monthly desk fee credits.

## COUNT I – DECLARATORY JUDGMENT

For Count I of their Complaint against DV, pursuant to 28 U.S.C. § 2201, Plaintiffs state:

82. Plaintiffs restate and incorporate by reference the allegations contained in Paragraphs 1 through 81 of their Complaint, as if more fully stated herein, as Paragraph 82.

83. Upon information and belief, the CFTC concluded that DV is legally responsible for the unlawful wash trades carried out through the First, Second, and Third Patterns. Upon information and belief, the CFTC and DV reached an agreement where DV would pay a $5,000,000 fine for its wrongful conduct.

84. The CFTC concluded that Elsasser is legally responsible for his participation in the Third Pattern, but should be fined only $200,000 based on his limited role and his cooperation with the CFTC's investigation.

85. The CFTC concluded that Rubin and Brown should not be fined or otherwise punished based on the wash trading that occurred at DV.

86.     DV's attempts to force Plaintiffs to pay for a fine imposed against it by CFTC are a transparent attempt to second-guess the CFTC's judgment and undermine the CFTC's authority to enforce the CEA as established by Congress.

87.     DV claims that Plaintiffs are liable for all, or a substantial portion of, its $5,000,000 CFTC fine and its related legal expenses. At times, DV has claimed Plaintiffs are liable for DV's fine pursuant to an alleged and unidentified oral agreement. At other times, DV has claimed that the fine imposed by the CFTC for DV's unlawful activity is a normal trading loss or expense, and thus should be allocated based on what DV has described as the "Standard Allocation" between the Parties. DV has also claimed at times that these fines for DV's illegal activity should be charged 100% to Plaintiffs' capital accounts.

88.     Plaintiffs maintain that DV is barred from seeking indemnification or contribution from Plaintiffs for a civil penalty imposed by the CFTC, or any other regulator or exchange, because it would contravene the purpose of monetary penalties under the CEA, undermine the CFTC's enforcement powers as granted to it by Congress, and reduce the deterrent effect of CFTC fines by allowing a trading firm impermissibly and unilaterally to shift penalties imposed by the CFTC down the "food chain" to individual traders that the trading firm employs and supervises.

89.     Plaintiffs further maintain that they have no agreement, written or oral, with DV to indemnify DV or to contribute to DV's payment of a fine imposed by the CFTC or DV's legal expenses and that, even if such an agreement existed, it would be unenforceable as against public policy.

90.     An actual controversy exists between DV and Plaintiffs over whether DV can seek contribution or indemnification from Plaintiffs for its $5,000,000 CFTC fine, or any other

- 15 -

fine levied on DV by any other regulator or exchange for the same conduct, and for related legal costs incurred by DV.

91. Plaintiffs have a tangible legal interest in not paying for DV's fine or legal expenses and DV has taken a position adverse to this interest by demanding indemnification and contribution from Plaintiffs.

## COUNT II – WASH TRADING PROHIBITED BY THE COMMODITY EXCHANGE ACT

For Count II of their Complaint against DV, pursuant to 7 U.S.C. §§ 6c & 25, Plaintiffs state:

92. Plaintiffs restate and incorporate by reference the allegations contained in Paragraphs 1 through 81 of their Complaint, as if more fully stated herein, as Paragraph 92.

93. DV has violated section 4c of the CEA, codified at 7 U.S.C. § 6c, by employing the First, Second, and Third Patterns to make unlawful wash trades and/or by willfully aiding, abetting, counseling, inducing, or procuring the commission of unlawful wash trades.

94. During their work as traders for DV, Plaintiffs, through DV, made contracts of sales of commodities for future delivery, options on such contracts or on a commodity, or swaps. Thus, 7 U.S.C. § 25 provides Plaintiffs with a private right of action against DV for this violation of the CEA.

95. Plaintiffs have suffered actual damages, in an amount to be proved at trial, as a result of DV's unlawful wash-trading activities carried out in violation of section 4c of the CEA including but not limited to:

    a. lost income due to the disruption in their trading that occurred when they were forced to leave DV based on their cooperation with the CFTC;

    b. lost income due to Plaintiffs flattening their positions in the market when they were forced to leave DV based on their cooperation with the CFTC;

    c. lost income from DV's hiring away of certain persons in retaliation for Plaintiffs' cooperation with the CFTC;

    d. lost income from starting a new business with a smaller foot print. Due to uncertainty surrounding DV's retaliation, Plaintiffs could not offer opportunities to many prior group members, which DV benefited from because they kept these employees;

    e. lost business opportunities based on reputational harm caused by DV's conduct;

    f. lost income due to Plaintiffs' lost opportunity to become partners at DV; and

    g. attorneys' fees and costs incurred in relation to the CFTC's investigation.

### COUNT III – CHEATING, FRAUD, OR DECEPTION PROHIBITED BY THE COMMODITY EXCHANGE ACT

For Count III of their Complaint against DV, pursuant to 7 U.S.C. §§ 6b & 25, Plaintiffs state:

96. Plaintiffs restate and incorporate by reference the allegations contained in Paragraphs 1 through 81 of their Complaint, as if more fully stated herein, as Paragraph 96.

97. DV has violated section 4b of the CEA, codified at 7 U.S.C. § 6b, by cheating or defrauding or attempting to cheat or defraud or willfully deceiving or attempting to deceive Plaintiffs in connection with DV's trading activities on the CME and in the Eurodollar Program, which activities included DV submitting orders to make and making contracts of sales of commodities for future delivery, or swap for, with, or on behalf of Plaintiffs.

98. DV has attempted to cheat, defraud, and/or willfully deceive Plaintiffs by withholding information from them regarding DV's wash-trading activities pertinent to the

CFTC's investigation, by attempting to pressure Plaintiffs not to cooperate with the CFTC, and by attempting to force Plaintiffs to indemnify and pay for a fine that the CFTC has determined DV—and not Plaintiffs—is responsible.

99. During their work as traders for DV, Plaintiffs, through DV, made contracts of sales of commodities for future delivery, options on such contracts or on a commodity, or swaps. Thus, 7 U.S.C. § 25 provides Plaintiffs with a private right of action against DV for this violation of the CEA.

100. Plaintiffs have suffered actual damages, in an amount to be proven at trial, as a result of DV's attempts to cheat, defraud, or willfully deceive Plaintiffs including but not limited to:

   a. lost income due to the disruption in their trading that occurred when they were forced to leave DV based on their cooperation with the CFTC;

   b. lost income due to Plaintiffs flattening their positions in the market when they were forced to leave DV based on their cooperation with the CFTC;

   c. lost income from DV's hiring away of certain persons in retaliation for Plaintiffs' cooperation with the CFTC;

   d. lost income from starting a new business with a smaller foot print. Due to uncertainty surrounding DV's retaliation, Plaintiffs could not offer opportunities to many prior group members, which DV benefited from because they kept these employees;

   e. lost business opportunities based on reputational harm caused by DV's conduct;

   f. lost income from DV's failure to pay Plaintiffs their agreed-upon monthly desk fee credit prior to leaving DV; and

g.  attorneys' fees and costs incurred in relation to the CFTC's investigation.

## COUNT IV – WHISTLEBLOWER RETALIATION PROHIBITED BY THE COMMODITY EXCHANGE ACT

For Count IV of their Complaint against DV, pursuant to 7 U.S.C. § 26(h)(1), Plaintiffs state:

101. Plaintiffs restate and incorporate by reference the allegations contained in Paragraphs 1 through 81 of their Complaint, as if more fully stated herein, as Paragraph 101.

102. Plaintiffs are "whistleblowers" under the CEA, 7 U.S.C. § 26(a)(7), because they provided information relating to DV's violations of the CEA to the CFTC in a manner established by rule or regulation by the CFTC, namely, by submitting a Form TCR to the CFTC.

103. DV, who retained Elsasser and Brown as traders from 2010 to 2016 and Rubin as a trader from 2011 to 2016, threatened, harassed, or otherwise discriminated against Plaintiffs because of lawful acts done by Plaintiffs in providing information to the CFTC and in assisting in the CFTC's investigation of DV related to such information, including by pressuring Plaintiffs not to cooperate with the CFTC by threatening legal action against them and by seeking to have Plaintiffs pay for the $5,000,000 fine imposed on DV by the CFTC.

104. Plaintiffs are not employees of the federal government.

## JURY DEMAND

105. Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A.  A declaratory judgment stating that DV cannot recover from Plaintiffs any portion of any fine imposed on DV by the CFTC or any other regulator or exchange, as well as DV's associated legal costs;

B. An award of monetary damages in favor of Plaintiffs and against DV, in an amount to be proven at trial, for all damages sustained by Plaintiffs as a result of DV's violations of 7 U.S.C. § 6c;

C. An award of monetary damages in favor of Plaintiffs and against DV, in an amount to be proven at trial, for all damages sustained by Plaintiffs as a result of DV's violations of 7 U.S.C. § 6b;

D. An award of monetary damages in favor of Plaintiffs and against DV, in an amount to be proven at trial, including back pay otherwise owed to Plaintiffs, with interest, and special damages, for all damages sustained by Plaintiffs as a result of DV's violations of 7 U.S.C. § 26; and

E. Such other and further relief as the Court may deem just and reasonable.

Respectfully submitted,

BRANDON ELSASSER, SETH RUBIN,
and COLLINS BROWN,

By: /s/ Renato Mariotti
One of Their Attorneys

Renatto Mariotti
Holly H. Campbell
Thompson Coburn LLP
55 East Monroe, 37th Floor
Chicago, Illinois 60603
Telephone: 312-346-7500
Facsimile: 312-580-2201
rmariotti@thompsoncoburn.com
hcampbell@thompsoncoburn.com