UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRANDON ELSASSER, SETH RUBIN, and COLLINS BROWN, <br><br> Plaintiffs, <br><br> v. <br><br> DV TRADING, LLC, <br><br> Defendant. | Case No. 17-CV-04825 <br><br> Judge Joan B. Gottschall |

## **OPINION AND ORDER**

Defendant DV Trading, LLC ("DV") has filed a Motion to Compel Arbitration of the claims in plaintiffs' four-count complaint. The arbitration clause DV is attempting to enforce appears in the operating agreement of its parent company, RCG Holdings, LLC ("RCG").

Based on the briefing before this court, it appears that plaintiffs' Count I, seeking a declaration that DV may not seek indemnification or contribution from plaintiffs' RCG trading accounts for fines imposed on DV by the Commodities Futures Trading Commission ("CFTC"), falls within the broad scope of the RCG Operating Agreement's ("Operating Agreement") arbitration clause. The subject of the Operating Agreement encompasses membership in RCG Holdings, the rights and duties of members, the establishment of trading accounts, and members' capital contributions. The issue of the circumstances under which DV can seek funds from members' capital accounts is clearly related to the subject of the Operating Agreement and is hence arbitrable. But in related arbitration proceedings, plaintiffs raise an issue not mentioned in their briefing here. They dispute whether they are bound by the Operating Agreement, given that they did not sign it. Ruling on Respondents' Rule 11(b) Mot. at 6, ECF No. 15. As part of their

1

supplemental briefing, plaintiffs will have the opportunity to clarify what exactly their position is on the arbitrability of Count I.

The court has no difficulty concluding that plaintiffs' Count IV, claiming whistleblower retaliation, is not subject to arbitration. As amended by the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111–203, 124 Stat. 1376, the Commodities Exchange Act ("CEA") provides clearly that pre-dispute arbitration agreements are not valid or enforceable if they require arbitration of a dispute arising under the whistleblower section. 7 U.S.C. § 26(n) (West 2018); *Santoro v. Accenture Fed. Servs., LLC*, 748 F.3d 217, 222 n.8 (4th Cir. 2014) (collecting cases). There is a great deal of law finding arbitration agreements severable in the sense that the arbitrability is analyzed claim by claim, *see, e.g.*, *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 997 (7th Cir. 2011) (district court has jurisdiction over nonarbitrable claims); *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 970–72 (7th Cir. 2007) (discussing discretion to stay nonarbitrable claims); so the court does not find it necessary to invalidate the entire Operating Agreement as long as it is not read to cover plaintiffs' whistleblower claim. *See Santoro*, 748 F.3d at 223–24. Defendant's contention that this claim is frivolous is of no moment. The issue is who gets to decide whether the claim is frivolous, and the CEA makes plain that it cannot be decided by an arbitrator pursuant to a pre-dispute arbitration agreement. § 26(n).

That leaves Counts II and III. In Count II, plaintiffs seek damages from DV for the effect on their trading activities caused by DV's illegal wash trading. Count III seeks similar damages based on DV's withholding of information from plaintiffs relating to DV's wash-trading activities.

As far as the court can tell, DV advances only one argument for the arbitration of these claims. It relies on two cases, *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 910 (7th Cir. 1999) and *Abinanti v. Leggett & Platt, Inc.*, 2001 WL 40806, at *4 (N.D. Ill. Jan. 16, 2016), advancing the contention that since the Operating Agreement made it possible for plaintiffs to become DV traders, the Operating Agreement is the but-for cause of any subsequent disputes with DV. Reply 7, ECF No. 14.

*Kiefer* does not go this far. In *Kiefer*, Kiefer and Tarkett were parties to two distributorship agreements, both of which contained arbitration agreements with "arising from or relating to the distributorship agreements" language such as the Operating Agreement here contains. *Compare* Operating Agreement 9, ECF No. 13-1, *with Kiefer*, 174 F.3d at 908. The second distributorship agreement came about when Tarkett agreed to give Kiefer a distributorship for the Kansas City market on the condition that Kiefer employ Rollins to manage the office serving that market. *Id.* Kiefer did so, but a couple of years later, Rollins left Kiefer to work for Tarkett, and Tarkett terminated its distributorship agreements with Kiefer. *Id.* Kiefer sued, alleging that Tarkett tortiously interfered with Rollins' employment contract. *Id.* at 909. Over Kiefer's objection, the district court compelled arbitration, and when Tarkett prevailed, Kiefer argued that the claim of tortious interference was beyond the scope of the arbitration clause of the second distributorship agreement. *Id.* The court of appeals noted that in one sentence of Kiefer's pleading, Kiefer alleged that Tarkett's solicitation constituted an interference with the employment contract between Kiefer and Rollins. *Id.* at 910. In the next sentence, Kiefer asserted that the same solicitation constituted a breach of Tarkett's duty not to interfere with Kiefer's performance of the distributorship agreement. *Id.* Since it was clear that the latter claim was arbitrable, it made no sense to treat differently the alleged fact that Rollins was

3

solicited from the underlying arbitrable claim that soliciting Rollins breached the parties' duties under the distributorship agreement. *See id.* But put more simply, the claim of breach of the distributorship agreement, which clearly fell within the scope of the arbitration clause, was factually based on the alleged tortious interference with Rollins' employment contract. The employment agreement which was the subject of the tortious interference claim was inseparable from the alleged breach of the distributorship agreement. *See id.* It is not a stretch to find the tortious interference claim "related to" the breach of the distributorship claim, and rather than apply a but-for test, the Seventh Circuit concluded that a "significant relationship" existed between Kiefer's claims and the distributorship agreement. *Id.* at 910–11.

In *Abinanti*, plaintiffs were former shareholders and employees of Met Displays, Inc. ("Met"), a manufacturer of store fixtures. 2001 WL 40806, at *1. Defendant Leggett & Platt acquired Met through a stock purchase agreement ("SPA"). *Id.* The SPA provided that each plaintiff would become an employee of defendant through an individual employment agreement. *Id.* The SPA contained a broad arbitration clause which exempted disputes relating to the purchase price of the stock, prior to the closing date of the stock purchase agreement. *See id.* Shareholders were to have thirty days after the preparation of the Closing Balance Sheet to give written notice of any disagreement. If they did not do so, the Closing Balance Sheet was to become final and binding, pursuant to which the purchase price would be set. *Id.*

At a future time, plaintiffs were terminated by defendant and filed a lawsuit alleging that defendant breached the SPA as well as each plaintiff's employment agreement; that defendant tortiously interfered with Met and the terminated employees, by directing Met to terminate the employees; that defendant took these actions in bad faith; and that defendant slandered plaintiffs when it published untrue statements involving plaintiffs' purported misconduct. *Id.* at *2.

4

Plaintiffs argued, in resisting arbitration, that their claims related to the calculation of the stock purchase price and thus fell within the exemption. They claimed that they were terminated so defendant could avoid paying $6.1 million of the $48 million purchase price that was guaranteed to them, as minority shareholders, via a performance-based bonus pool. *Id.* at *3. Thus, plaintiffs argued, their claims involved the purchase price and fell within the arbitration clause's exemption.

The district court disagreed. The exemption provision dealt with the calculation of the purchase price, which had already been calculated and to which all parties had agreed. *Id.* at *4. The bonus pool was not mentioned in the exemption provision but was governed by another portion of the SPA. *Id.* Insofar as plaintiffs claimed that their employment agreements were breached, the employment agreements were contemplated by the SPA, which mentioned the employment agreements and the bonus pool, and were thus subject to arbitration. Relying on *Kiefer*, the court ruled that if the factual allegations underlying the slander, tortious interference and bad faith claims fell within the arbitration provision, then those claims would be arbitrable. *Id.* Finding that the factual allegations fell within the arbitration clause, the court held those claims arbitrable. It then said, in the language upon which defendant here relies, "But for the SPA and the Employment Agreements, Plaintiffs' claims would never have arisen. They arise from the very heart of their relationship with Defendant." *Id.* Citing *Kiefer*, the district court held that those claims were, for that reason, "logically 'contemplated' by the SPA" and were thus subject to arbitration. *Id.*

The but-for test DV derives from *Abinanti* is not, as far as this court can tell, based on *Kiefer*. If taken literally, its scope would be essentially limitless: any agreement setting up a company which contains an arbitration clause requires arbitration of any dispute relating to that

5

company even if the dispute involves a separate (but related) corporation, whether or not the dispute involved was contemplated by that agreement. Notably, the *Abinanti* court set out the *Kiefer* "significant relationship" test for the clause's scope. 2001 WL 40806, at *4 (citing *Kiefer*, 174 F.3d at 910). In any event, it is the *Kiefer* standard that this court is bound to apply regardless of what *Abinanti* holds. *See Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033–34 (7th Cir. 2012) (citing and applying *Kiefer*'s "significant relationship" language).

In the case at bar, DV, the company whose actions allegedly precipitated Counts II and III, is nowhere discussed in the Operating Agreement or in its arbitration clause. While it is clear that if there had been no Operating Agreement, plaintiffs would never have worked for DV, does that mean that any dispute arising out of the relationship between plaintiffs and DV is arbitrable? That is what *Abinanti*, applied literally, seems to suggest.

The problem with *Abinanti*'s but-for analysis, as applied to the instant case, is that it does not deal with the contractual scope of the Operating Agreement's arbitration clause. The arbitration clause is contained in the Operating Agreement, which covers the structure of RCG Holdings, LLC: its membership classes; admission to membership; member accounts and repayment rights of dissociating members; restrictions on transfers of memberships; voting rights; distributions from accounts; conflicts of interest; the effect of bankruptcy or insolvency of members; limitation of liability; dissolution and liquidation; members' capital contributions; management of RCG; and the maintenance of company books and records: all issues relating to the structure and management of RCG Holdings. DV has taken the position in related arbitration proceedings that it, along with related entities, initiated that an "unwritten agreement to allocate profits, losses, business expenses and costs" existed. ECF No. 15 at 3. Does that separate alleged agreement bear a significant relationship to the operating agreement DV wants to enforce

here? It is not clear to this court how an agreement setting up the structure and management of RCG Holdings covers damage actions by RCG Class C members alleging illegal conduct by DV, which again is nowhere mentioned in the Operating Agreement. *See generally Gore*, 666 F.3d at 1034–35.

The parties' briefs make short shrift of the issue of the arbitrability of Counts II and III. In its opening memorandum, defendant emphasizes the "baseless" nature of these claims. Mem. Supp. Mot. to Stay 6, 9 & n.2, ECF No. 10. Baseless or not, the issue is who makes that decision. If the parties have anything more to say directed to these counts, they may do so in cross-briefs due on or before August 14, 2018. Plaintiffs may also clarify their position on Count I.

Date: July 31, 2018                                    /s/
                                                       Joan B. Gottschall
                                                       United States District Judge