# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRANDON ELSASSER, SETH RUBIN, and COLLINS BROWN, ) ) ) | |
| Plaintiffs, ) | Case No. 17-cv-04825 |
| ) | |
| vs. ) | |
| ) | |
| DV TRADING, LLC, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(B)(1) AND TO COMPEL ARBITRATION OF ANY REMAINING CLAIMS AND STAY ANY NON-ARBITRABLE CLAIMS

Date: April 19, 2019

Seth A. Stern, Esq. (sstern@fvldlaw.com)
**FUNKHOUSER VEGOSEN LIEBMAN
& DUNN LTD.**
55 West Monroe Street, Suite 2300
Chicago, Illinois 60603
Tel: (312) 701-6800
Fax: (312) 701-6801
ARDC No. 6300954
*Attorney for Defendant*

Respectfully submitted,

**DV TRADING, LLC**

By: /s/ Seth A. Stern
One of its attorneys

Plaintiffs do not belong in this Court and their contradictory positions put them in an inextricable dilemma. They sought access to federal court by alleging personal injury only to find that their claims would then need to be arbitrated. Plaintiffs thereupon reversed field, asserting in memoranda that the *real* parties in interest are Plaintiffs' trading entities. This admission, of course, triggers dismissal for lack of standing. It also prompted the Court to order veil piercing discovery, which demonstrated that, regardless of which story to believe, Plaintiffs may not interpose pass-through entities to avoid the pending arbitration before Judge Epstein.

Plaintiffs' Complaint contains a state law claim for a declaratory judgment (Count I) that they are not liable for fines imposed by the Commodity Futures Trading Commission ("CFTC") due to their unauthorized proprietary trading activities for DV. Counts II – IV are inapposite claims under the Commodity Exchange Act ("CEA") which apparently were tacked on for jurisdictional purposes. Plaintiffs alleged that they were Class C Members of DV's former parent company, RCG Holdings, LLC ("RCG") pursuant to its Operating Agreement, and held funds in capital accounts at RCG to fund their trading for DV. Plaintiffs seek damages for alleged lost income to those capital accounts. Complaint, ¶ 11 - 13, ¶ 87, 95, 100. *See also*, ECF No. 13, p. 2 ("Plaintiffs Elsasser, Brown, and Rubin ... were Class C Members of [RCG]…").

Based on these allegations, DV moved to compel arbitration pursuant to RCG's Operating Agreement, which sets forth member rights and obligations with respect to capital accounts, and contains a broad arbitration provision. ECF No. 9-10. On September 24, 2018 (ECF No. 25, p. 4-5), the Court denied DV's motion without prejudice *only* because Plaintiffs changed their story and now claim they were not Class C Members of RCG, did not sign RCG's Operating Agreement,

and did not hold capital accounts with RCG – instead, their entities did.[1] *See* ECF No. 16, pp. 1-2 (order requesting clarification after Plaintiffs contradicted themselves in the arbitration).

The Court recognized that none of Plaintiffs' other defenses to arbitration held water because the Operating Agreement's arbitration provision is "exceedingly broad" and "if the plaintiffs are bound by the arbitration clause, Counts I, II and III must be arbitrated." ECF No. 25, p. 4.[2] The Court made clear that, but for Plaintiffs' belated about-face, it would have compelled arbitration.

Recognizing that DV was prejudiced by Plaintiffs' reversal, the Court allowed discovery regarding (i) whether Plaintiffs had standing individually in light of their admission, (ii) whether Plaintiffs are estopped from hiding behind their entities to evade arbitration, and (iii) whether Plaintiffs must arbitrate because their entities are subject to veil piercing. ECF No. 25, p. 5; ECF No. 28 (ordering discovery). The evidence now requires that this case be dismissed pursuant to Fed R. Civ. P 12(b)(1), and that any claims not dismissed be arbitrated. As detailed herein:

(a) Plaintiffs lack standing because their statutory claims rely on damages that (i) only could have been suffered by their entities, and/or (ii) are not recognized by the CEA, leaving the Court without jurisdiction over their pendent declaratory judgment claim;

(b) Plaintiffs are estopped from evading arbitration because they (i) benefited personally from RCG's Operating Agreements by having their entities pass through trading profits, and (ii) sought to personally recover, in this litigation, alleged lost profits that they now admit would be owed to their entities under the RCG Operating Agreement; and

(c) Plaintiffs' entities are subject to veil piercing when, among other things (i) they served as personal piggy banks that Plaintiffs used to pay for everything from day-to-day personal lunches, to residential utility bills to Las Vegas strip clubs, (ii) they are further

---

[1] Plaintiffs broke their January, 2018 promise to Judge Epstein that they would correct their false Complaint. ECF No. 22, p. 4 ("As to [Plaintiffs'] statement in the federal court lawsuit that they were Class C Members of RCG, further investigation has shown that … [they] were not. Accordingly, [Plaintiffs] … will take appropriate steps in the federal court lawsuit to amend their pleadings accordingly"). *Compare* Complaint, ¶ 11 ("each Plaintiff held funds in an account at RCG Holdings, which they used to fund their trading activities") and ¶ 13 ("Plaintiffs requested to withdraw the funds they held in their RCG Holdings capital accounts") *with* ECF No. 24 (Plaintiffs' Supplemental Memorandum) p. 4 ("Plaintiffs do not hold capital accounts at RCG.") and p. 2., n. 2 (admitting Plaintiffs incorrectly represented to the Court that they were Class C Members of RCG). *See also* **Ex. A** (Dep. of Brandon Elsasser), pp. 6-9; **Ex. B** (Collins Brown), pp. 34-37 and **Ex. C** (Seth Rubin), pp. 6-9 (each admitting Complaint was incorrect).

[2] The Court recognized that Count IV for whistleblower retaliation is exempted from arbitration by the CEA but, as discussed *infra*, that claim should also be dismissed for lack of standing.

2

commingling their business and personal accounts in this very litigation by having their otherwise inoperative entities pay for them to prosecute their purported personal claims.

### I. Legal Standard

Rule 12(b)(1) permits a defendant to move for dismissal where there is a lack of subject-matter jurisdiction and/or standing. *Jimenez v. Illinois*, No. 11-CV-4707, 2012 WL 174772, at *2 (N.D. Ill. Jan. 18, 2012), *aff'd sub nom.*, 498 F. App'x 633 (7th Cir. 2012) (plaintiff did not meet definition of victim under the Rights of Crime Victims and Witnesses Act). Surviving a Rule 12(b)(1) motion is more difficult than a 12(b)(6) motion because the plaintiff, not the defendant, bears the burden of proving jurisdictional requirements have been met. *Id. see also Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1549 (2016) (statutory claims must satisfy statutory standing requirements as well as Article III requirements). "A person cannot predicate standing on an injury which he does not share." *Conrad v. Nutramax Labs., Inc.,* No. 13 C 3780, 2013 WL 5288152, at *2 (N.D. Ill. Sept. 18, 2013) (internal cite omitted) (plaintiff did not purchase the product at issue).

Unlike Rule 12(b)(6), "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted" to determine whether it has jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 444 (7th Cir.2009) (internal cites omitted) (affirming dismissal where Plaintiff assigned its rights to a third party). Thus, once Defendant presents evidence that calls Plaintiffs allegations into doubt, "[t]he presumption of correctness that we accord to a complaint's allegations falls away." *Id.* Due to "the importance of limiting federal jurisdiction … if the facts place the district court on notice that the jurisdictional allegation probably is false, the court is duty-bound to demand proof of its truth." *Id. See also Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir. 1995).[3]

---

[3] If the Court believes that any arguments herein should have been raised under Rule 12(b)(6) the Court may treat them as though raised under Rule 12(b)(6) or Rule 56. *Malak v. Associated Physicians, Inc*., 784 F.2d 277, 280 (7th Cir.1986); *Buie v. Experian Information Solutions, Inc*., 1998 WL 729614, *1 (N.D. Ill. 1998).

3

In determining arbitrability, "any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration". *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012). Here, the Court "easily" determined that the arbitration clause in RCG's Operating Agreement encompasses Plaintiffs' claims. ECF No. 25, p. 4. The only issue is whether Plaintiffs can evade the Operating Agreement by belatedly asserting that they only signed on behalf of their entities. Of course, even non-signatories are compelled to arbitrate if (a) they are estopped because they directly benefited under the agreement, or (b) entities for which they signed are subject to veil piercing. *Fyrnetics (Hong Kong) Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002) (*citing Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)).

When a complaint raises both arbitrable and non-arbitrable issues, the court should stay the entire case to avoid "risk[ing] inconsistent rulings." *G&G Closed Circuit Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241, at *9-11 (N.D. Ill. Mar. 22, 2017) (citing authorities).

**II.     Argument**

This Court should dismiss Plaintiffs' CEA claims for fraud and wash trading (Counts II and III) for lack of standing because Plaintiffs' alleged damages (a) are not recoverable under the CEA and, (b) even if they were recoverable, such damages would belong only to their entities. Plaintiffs similarly lack standing for Count IV (whistleblower retaliation) because they were not DV's employees and cannot allege injury affecting the terms of their employment under 7 USC 26(h)(1)(A). Dismissal of the statutory claims divests the Court of jurisdiction over Plaintiffs' pendent declaratory judgment claim (Count I), which arises under state law.

To the extent any claims survive, the Court should compel arbitration (and stay any non-arbitrable claims) because Plaintiffs are estopped from relying on sham entities to evade arbitration

4

and because Plaintiffs' egregious comingling and disregard for their entities' distinct identities (including having their entities fund this litigation) require piercing of the entities' corporate veils.

### A. Plaintiffs Lack Standing to Bring Their Statutory Claims (Counts II through IV)

#### i. Counts II and III must be dismissed in light of Plaintiffs' admissions that they suffered no actionable injuries in their individual capacities

Counts II and III seek damages based on profits Plaintiffs contend they would have received but for DV's alleged violations. Compl.¶¶ 95, 100. Each Plaintiff, however, now admits RCG paid profits to their entities, and any lost profits would have been suffered by the entities. *Compare* **Ex. A**, p. 9: 10-13 (Elsasser's testimony that "[b]ecause I was a shareholder in Fulton Market Trading Company, if Fulton Market Trading Company lost the potential to earn money, I lost the potential to earn money") *with Nocula v. UGS Corp.*, 520 F.3d 719, 726 (7th Cir. 2008). ("the claimed tort and contract injuries were to [the corporation's] interests; as sole shareholder, [plaintiff] lacks standing to sue for redress of the corporation's injuries."); *Apex,* 572 F.3d at 444 (dismissing where alleged damages belonged to a third party). *See also* **Ex. B**, pp. 41-43; **Ex. C**, pp. 9-11; 14: 2-5.

Plaintiffs' prayer for attorney's fees relating to the CFTC investigation and other indirect damages (¶¶ 95, 100) is barred because (i) Plaintiffs' entities paid the fees (**Ex. D**) (stipulation)[4], and (ii) the CEA does not permit recovery of legal fees or consequential damages. 7 USC 25.

#### ii. Plaintiffs also lack standing because they were not sellers of commodity contracts and their damages were not incurred in the course of trading

Plaintiffs contend that they have standing under 7 USC 25 to bring Counts II and III because "Plaintiffs, through DV, made contracts of sales of commodities for future delivery, options on such contracts or on a commodity, or swaps." Compl., ¶¶ 94, 99. Plaintiffs, however, were proprietary traders engaged to trade *DV's* accounts, not their own. **Group Ex. E** (Plaintiffs'

---

[4] After Plaintiffs testified in depositions that they were funding this lawsuit through their entities, their attorney agreed to provide the stipulation attached as Ex. D in lieu of producing billing records pursuant to subpoena.

5

Trading Agreements).[5] Standing under the CEA "requires that [Plaintiff] itself have been an actual purchaser or seller" of commodity futures contracts. *Scottrade, Inc. v. BroCo Investments, Inc.*, 774 F. Supp. 2d 573, 579 (S.D.N.Y. 2011).[6] *See also Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 871-72 (N.D. Ill. 2010) (dismissing for lack of standing where Plaintiffs did not purchase futures contracts through the defendant).

A proprietary trader lacks standing to bring a CEA claim against the firm that engaged him to trade its accounts. *Klein & Co. Futures v. Bd. of Trade,* 464 F.3d 255, 260 (2d Cir. 2006) (standing limited to "plaintiff[s] who actually traded in the commodities market … [Plaintiff's] losses were not the result of its purchases or sales in the commodities market."). Instead, proper plaintiffs are "persons defrauded in connection with a futures transaction conducted on their behalf," *i.e.,* "traders of futures for whom a transaction was conducted." *DGM Investments, Inc. v. New York Futures Exch., Inc.*, 288 F. Supp. 2d 519, 526 (S.D.N.Y. 2003). Plaintiffs' trades were conducted on ***DV****'s behalf. *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 550 F. Supp. 144, 145 (S.D.N.Y. 1982) (alleged fraudulent transactions were not "for or on behalf of" plaintiff.).

Moreover, even if Plaintiffs had been actual purchasers, they would lack standing under § 25 to pursue indirect and consequential damages like lost future profits, attorney's fees resulting from regulatory investigations, and reputational harm. Rather, § 25 authorizes only recovery of damages suffered "in the course of trading on a contract market." *Thompson's Gas,* 691 F. Supp. 2d at 871 (N.D. Ill. 2010) (*citing Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1153 (7th Cir. 1992)); *see also Klein & Co.Futures v. Bd. of Trade of City of New York*, No. 00CIV.5563GBD, 2005 WL 427713, at *4 (S.D.N.Y. Feb. 18, 2005), *aff'd,* 464 F.3d 255; *DGM,*

---

[5] At the time of the Trading Agreements, DV's LLC name was Rosenthal Global Securities, LLC. **Ex. F**.
[6] *Scottrade* was decided under securities law but the standing analysis was identical to the CEA. *Id.* at 579.

265 F.Supp.2d at 263 (S.D.N.Y.2003) (only plaintiffs who incur losses on the contract market have standing under the CEA). Counts II and III must therefore be dismissed under Rule 12(b)(1).

### iii. Count IV must be dismissed because Plaintiffs were not DV's employees and cannot allege retaliation affecting their terms of employment

The CEA limits whistleblower protection by providing that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower *in the terms and conditions of employment*." (emphasis added). 7 USC 26(h)(1)(A). Plaintiffs lack standing to raise a whistleblower retaliation claim (Count IV) because (a) they were not employees and, (b) even if they had been employees, none of the alleged post-employment "retaliation" related to the terms of their employment.

Plaintiffs each admit that they were employed and paid by their own entities, not DV. *See* **Ex. A**, p. 12: 12 – 13; p. 16: 16-24; p. 19: 17-18, **Ex. B** p. 14: 21 – 24; p. 32: 3 – 12; p. 43: 1-4, **Ex. C**, p. 18: 6 – p. 19: 7. RCG, not DV, paid Plaintiffs' *entities* their share of trading profits, and issued the entities Form 1099s, allowing Plaintiffs to take advantage of tax benefits not available to employees. **Ex. G** (sample Forms 8949 showing 1099-B income from RCG). The *entities* then paid Plaintiffs salaries and issued them W-2s. **Ex. H**.[7] Since Plaintiffs' entities, and not Plaintiffs, were paid by RCG, and neither Plaintiffs nor their entities were paid or employed by DV, Plaintiffs do not have standing to bring an employee whistleblower claim against DV. 17 CFR 165.2(p)(1) ("A company or another entity is not eligible to be a whistleblower.").

Regardless, all of Plaintiffs' alleged retaliation occurred *after* they "resigned" – indeed, Plaintiffs allege DV retaliated against them *for leaving* DV. Compl., ¶¶ 74-81. Statutes limited to retaliation affecting "terms and conditions of employment" exclude post-employment retaliation.

---

[7] As discussed *infra,* Plaintiffs' claim that they were employee whistleblowers further supports piercing the entities' corporate veils. It is disingenuous to stand behind the entities for tax purposes while asserting whistleblower rights belonging to individual employees. Cf. *Stamp v. Inamed Corp.*, 777 F. Supp. 623, 626-27 (N.D. Ill. 1991).

7

*Potts v. Ctr. for Excellence in Higher Educ., Inc.,* 908 F.3d 610, 618 (10th Cir. 2018) (limitation "unambiguously excludes relief for retaliatory acts occurring after the employee has left employment. So our inquiry ends there."); *Taul v. Nagel Enterprises, Inc.*, No. 2:14-CV-0061-VEH, 2017 WL 4956422, at *4 (N.D. Ala. Nov. 1, 2017) ("This Court, like many, is persuaded that the most natural reading … is that it does not create a claim for post-termination retaliation.") (citing *U.S. ex rel. Head v. Kane Co.*, 798 F.Supp.2d 186, 207-208 (D.D.C. 2011)); *Elkharwily v. Mayo Holding Co.*, 84 F. Supp. 3d 917, 927 (D. Minn. 2015), *aff'd,* 823 F.3d 462 (8th Cir. 2016) (claims are "limited to adverse treatment in the terms and conditions of employment and do not apply to allegations of post-termination retaliation."); *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 306 (S.D.N.Y. 2014) (dismissing post-employment retaliation claim); *Bechtel v. St. Joseph Med. Ctr., Inc.*, No. CIV.A. MJG-10-3381, 2012 WL 1476079, at *9 (D. Md. Apr. 26, 2012) (same). Thus, Plaintiffs lack standing because they cannot allege retaliation recognized by the CEA.

### iv. The Court lacks jurisdiction over pendent Count I (Declaratory Judgment)

Without the statutory claims, the Court lacks jurisdiction under 28 U.S.C. § 1331 over the declaratory judgment count. Plaintiffs admit the controversy arose because DV expects them to contribute to the fines. Compl. ¶¶ 75, 87. Whether Plaintiffs' purported defenses to DV's claims invoke the CEA is irrelevant because "[a] defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

Plaintiffs cannot raise their defense to contribution via declaratory judgment because federal courts lack jurisdiction "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action." *Franchise Tax Bd. v. Constr. Laborers*, 463 U.S. 1, 16 (1983). *See also Bd. of Directors of War Mem'l Hosp. v. Baker*, 314 F. App'x 529, 533 (4th Cir. 2008) ("It is well-settled that "a plaintiff cannot evade the well-pleaded

8

complaint rule by using the declaratory judgment remedy to recast what are in essence merely anticipated or potential federal defenses.'"). Instead, where a declaratory judgment

> seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court … Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law.

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.,* 344 U.S. 237, 248 (1952).

Even if defenses could confer jurisdiction, Plaintiffs' defenses do not arise under the CEA just because the CFTC issued fines. "For example, a dispute over the assignment of a copyright does not arise under the federal copyright law, at least where the dispute does not require an interpretation of that law … even though the copyright is a creation of that law." *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 184 (7th Cir. 1984) (case not removable despite immaterial connections to CEA); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990) (same).

Plaintiffs do not rely on the CEA in contending that, as a matter of *common law*, contracting parties cannot indemnify one another for government fines.[8] Compl. ¶ 86. This argument has been rejected without reference to the CEA. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY § 401 cmt. d (agent can be liable for "**the payment** of damages **by the principal** … **of a fine to the state in case of a crime**.") (emphases added). Plaintiffs' legerdemain "would bring into the federal courts a host of disputes that do not require the skill and experience of federal judges in interpreting federal law, and the decision of which one way or another would not vitally affect the objectives of any federal law." *Bernstein*, 738 F.2d at 184; *Merrell,* 478 U.S. at 817 (allegation of federal violation as element of a state claim does not confer jurisdiction). Count I should be dismissed.

---

[8] Plaintiffs admit the declaratory judgment they seek has nothing to do with federal law by lumping in fines imposed by "any other regulator or exchange" regardless of whether they are issued under the CEA. Compl. ¶¶ 88, 90.

9

### B. To the extent any claims remain, Plaintiffs are estopped from using their purported entities to evade their obligations to arbitrate

"A party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause." *Am. Bureau*, 170 F.3d at 353; *Everett v. Paul Davis Restoration, Inc.,* 771 F.3d 380, 384 (7th Cir. 2014). Accordingly, if any claims survive dismissal, Plaintiffs should be compelled to arbitrate. *See Gersten v. Intrinsic Techs., LLP*, 442 F. Supp. 2d 573, 581 (N.D. Ill. 2006) (estoppel required arbitration).

Plaintiffs were able to trade through DV because their entities signed the Operating Agreement to establish an RCG capital account. They paid themselves from the profits RCG remitted to their entities' capital accounts pursuant to its Operating Agreement. Compl. ¶ 11; **Ex. A**, p. 12: 12 – p. 13: 18; pp. 20 -26; **Ex. B**, pp. 18 – 20; p. 32: 3-12; **Ex. C**, pp. 20-21; p. 18: 6 – p. 19: 7. *Cf. Am. Bureau*, 170 F.3d at 353 (yacht owners estopped after they received lower insurance rates and ability to sail under the French flag under agreement incorporating arbitration provision). Plaintiffs also benefited from the Operating Agreement because it allowed them to attract personnel and trade upon the name, goodwill and reputation of DV and RCG. *Everett,* 771 F.3d at 384 (non-signatory estopped from denying arbitrability under franchise agreement).

Ironically, Plaintiffs continue seeking benefits of the Operating Agreement here by claiming lost profits they admit would belong to their entities under the Operating Agreement. Complaint ¶¶ 95, 100; *supra* Section II(A)(i). *Cf. Gersten,,* 442 F Supp. 2d at 580 (non-signatory whose damages arose under agreement containing arbitration provision estopped from evading arbitration); *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, No. 04 C 1190, 2007 WL 951943, at *5 (N.D. Ill. Mar. 27, 2007) (same); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991) (citing *Goldstein v. Scott,* 108 Ill. App. 3d 867 (1982)) (estoppel from taking contrary positions regarding whether entity was entitled to benefits of incorporation).

Thus, not only are Plaintiffs estopped from denying arbitrability, they have admitted they are "third-party beneficiar[ies] … bound by the contract's arbitration provision." *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, No. 04 C 1190, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007) (citing *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir.2000) (non-signatory seeking compensation through a distribution agreement is a third-party beneficiary required to arbitrate all disputes concerning that agreement)).

### C. Plaintiffs must also be compelled to arbitrate any remaining claims because their entities serve as their alter-egos and are subject to veil piercing

Veil piercing is appropriate where (a) "the separate personalities of the corporation and the individual" no longer exist due to unity of interest, and (b) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Securities, LLC v. Banco Panamericano, Inc*., 674 F.3d 743, 752 (7th Cir. 2012). Both prongs are easily satisfied here. Plaintiffs' Complaint in this very case is an example (but far from the only one) of Plaintiffs' disregard of their entities' separate existences. It would be unjust for Plaintiffs to invoke their entities to resist arbitration after Plaintiffs used them to pay personal expenses, failed to capitalize them, listed non-existent loans on tax forms, and failed to maintain corporate records.

#### i. Plaintiffs subjected their entities to veil piercing by using them to fund litigation in their own names to recover entity damages

To find that Plaintiffs forfeited their entities' separate existences, the Court need look no further than their efforts here to recover entity damages for themselves, on their entities' dimes. *B. Kreisman & Co. v. First Arlington Nat. Bank of Arlington Heights*, 91 Ill. App. 3d 847, 850–51 (1980) (piercing veil where restaurant owner sued to recover company damages in her individual capacity because "the entity of the corporation was relied upon by her only when it was to her advantage") (cited favorably by *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 523 (7th

11

Cir. 1991)). By financing personal litigation through their entities (and seeking to divert alleged company damages to themselves), Plaintiffs "essentially inculpate[] [them]selves by admitting that [their entities] are corporate shells." *Lumpkin*, 933 F.2d at 460. "[P]ersons who choose to become incorporated may not evade the consequences of corporateness when that would suit their convenience," *i.e.*, when they want to sue to pocket entity damages, but not when they want to evade arbitration. *Stamp*, 777 F. Supp. at 626-27. Plaintiffs' efforts to use their entities as both sword and shield in this litigation, however, is far from the only reason for veil piercing – indeed, discovery showed that the entities served as little more than personal piggy banks for Plaintiffs.

### ii. Plaintiffs' commingling also shows that their entities were alter-egos

Courts routinely find unity of interest when commingling of business and personal funds renders recognition of a separate corporate existence unjust. *Steiner Elec. Co v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 13, 57; *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 571-72 (7th Cir. 1985). The most obvious form of comingling is entities paying personal expenses. *Macaluso v. Jenkins*, 95 Ill.App.3d 461, 466–67 (1981). In *Macaluso,* the entity paid $275.48 to repair the owner's personal automobile and paid for personal dinners and entertainment. See also *Sea-Land*, 941 F.2d. at 521 (owner charged "various personal expenses (including $460 for a picture of himself with President Bush)" to company); *Sea-Land,* 993 F.2d 1309.

Plaintiffs' commingling was far more egregious. For example, during one trip to Las Vegas Elsasser used Fulton Market's AMEX card to pay for a $4,000 tab at MGM's Wet Republic adult pool, a $173 tab from K-Kel, Inc. (d/b/a the Spearmint Rhino, a Las Vegas strip club),[9] and for over $3,200 in hotel stays. **Ex. I,**[10] p. 1 (referenced charges are highlighted for the Court's

---

[9] **Ex. J** is a filing by "K-Kel, Inc. d/b/a Spearmint Rhino" in an unrelated case (the Nevada Secretary of State website does not list assumed names). *See Opoka v. INS*, 94 F.3d 392, 394 (7th Cir.1996) (judicial notice of court records).
[10] The AMEX records attached hereto were produced by American Express per subpoena. **Ex. I**, pp. 9 – 14 (page numbers added for ease of reference).

convenience)[11]. Similarly, Brown charged $100 to a pediatric doctor, (**Ex. I**, p. 2) and another $500 to MetroSquash, a summer camp (**Ex. I**, p. 3). Rubin spent $431 of corporate funds at Ralph Lauren (**Ex. I**, p. 4) and $459 on TIVO television services (**Ex. I**, p. 5). Plaintiffs each charged their entities for personal meals (*i.e.*, low-priced lunches for one that obviously were not business meetings), Starbucks, and other obvious personal expenses. **Ex. I**, pp. 6 – 8. Elsasser admitted at his deposition that he used entity funds for personal housing costs, personal gas and cable bills, and other personal costs. (See, **Ex. A**, pp. 53:20 – 58 (discussing Bates No. PL001490, 1498, 1509, 1513)[12]; pp. 63 – 68 (discussing Bates No. 1588)). His best excuse for charging housing costs to his entity was that he was going through a divorce and needed a good night's sleep to focus on work. **Ex. A,** pp. 64-65; *Cf. Auto. Fin. Corp. v. Joliet Motors, Inc.,* 761 F. Supp. 2d 789, 794 (N.D. Ill. 2011) (entity paid personal expenses including television and utility bills).

Further, Plaintiffs arbitrarily transferred money from their entities to themselves. (See, **Ex. K**, pp. 4, 5; **Ex. L**, pp. 2, 4; **Ex. M**, pp. 1, 3).[13] Cf. *Steiner Elec.*, 2016 IL App (1st) 132023, ¶ 13 & 57 (veil piercing appropriate where owner "transfer[ed] money on multiple occasions for no official corporate reason"); *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 613 (7th Cir. 2009) ("the controlling shareholder transferring of profits out of the corporation … fits a 'typical pattern' among under-capitalized corporations"). Plaintiffs reported some transfers to the IRS as wages and others as distributions, but admit there was no rhyme or reason as to how they classified the payments. (See, **Ex. A**, pp. 88-96 (discussing Bates No. PL001387 & 0944); **Ex. B**, p. 20: 10-24; p. 22: 5-10; pp. 77-78; pp. 98-100 (discussing Bates No. 2503 & 2505); **Ex. C**, pp. 21-23; 62

---

[11] Account numbers and personally identifying information have been redacted from exhibits attached hereto.
[12] Exs. A-C are full deposition transcripts but, for the sake of brevity, only excerpts from deposition exhibits that are referenced in testimony discussed in this memorandum are included after the transcripts and cited by bates number.
[13] Elsasser testified that he believed account 0037 (**Ex. A**, p. 70) and 3692 (**Ex. A**, p. 71) were his personal accounts. Likewise, Rubin testified that account 6309 was his personal account. **Ex. C**, p. 55. Brown said he could not remember account numbers but admitted paying himself routinely. **Ex. B**, pp. 76 - 81.

(discussing Bates No. 0369 & 0371). Startlingly, Plaintiffs' tax returns show various "loans from shareholders" but Plaintiffs all admitted there were no such loans. (See, **Ex. A**, p. 91: 7-13; 93: 8-20 (discussing Bates No. PL001030); **Ex. B**, p. 99:13-24, 113: 10-22 (discussing Bates No. 2505); **Ex. C**, p. 62:21-63:16; 69:10-15 (discussing Bates No. 0371)).

### iii. Veil piercing is also required because the entities were undercapitalized

Plaintiffs' entities also should be disregarded because they were undercapitalized, rendering them "mere liability shield[s]." *Harris Custom Builders, Inc. v. Hoffmeyer*, 2001 WL 811661 (N.D. Ill. 2001). Plaintiffs each initially invested $1,000 in their entities. **Ex. N**. This is insufficient to cover expenses and the potential liabilities (like a CFTC fine) a trading entity could face. *On Command Video Corp. v. Roti*, 705 F.3d 267 (7th Cir. 2013) ($1,000 was "too little to satisfy even a tort judgment resulting from a minor accident…"). The undercapitalization continued, requiring frequent transfers back to the entities after Plaintiffs' premature withdrawals. *See, e.g.,* **Ex. A** p. 77: 4-9 (acknowledging he transferred money into the entity as needed to cover expenses); **Ex. K**, pp. 1 – 3; **Ex. L**, pp. 4, 5; **Ex. M**, pp. 2, 4, 6.[14] *Cf. Harris*, 2001 WL 811661 (An entity that keeps an insufficient balance to pay its debts is inadequately capitalized); *Nat. Ass'n of System Administrators, Inc. v. Avionics Solutions, Inc*., 2008 WL 140773,*7 (S.D. Ind. 2008) (owner "funneled corporate assets into his personal accounts almost immediately after he received them").

Worse yet, Plaintiffs essentially emptied the entity accounts in October, 2016, when they ceased doing business. **Ex. K**, p. 6; **Ex. L**, p. 6; **Ex. M**, p. 4-5. *Cf.* 805 ILCS 5/9.10(c) ("No distribution may be made if, after giving it effect the corporation would be insolvent…"). Plaintiffs testified they now fund the inactive entities only as needed to finance litigation, but maintain no

---

[14] Bank account records attached hereto (other than those produced by Plaintiffs and bates stamped "PL") were produced by the banks. **Ex. K**, p. 8; **Ex. L**, p. 8; **Ex. M**, p. 8. DV had to subpoena the banks because Plaintiffs produced incomplete bank records. To the extent Plaintiffs raise foundation or other objections with respect to bank records obtained from banks after their depositions, DV requests leave to take supplemental depositions.

reserves to, for example, defend potential counterclaims or pay damages. **Ex. A**, pp. 9:15 - 10:3; **Ex. B** pp. 10:7 – 13:6; **Ex. C**, pp. 16:15 – 17:20. (See, **Ex. K**, p. 7; **Ex. L**, p. 7; **Ex. M**, p. 7). *Cf. Banzakry v. Patel,* 2017 IL App (3d) 160162, ¶ 66 (inequitable to "establish and maintain a corporation that carries on business without sufficient assets available to meet its debt.").

### iv. Plaintiffs' entities are also subject to veil piercing because they failed to follow corporate formalities

Plaintiffs' failure to document entity actions (*e.g.* loans, wages, distributions) shows a lack of formalities providing one more basis for veil piercing. *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 505 (2005) (absence of resolutions required veil piercing); *Laborers' Pension Fund v. Lay-Com, Inc.*, 455 F. Supp. 2d 773, 787 (N.D. Ill. 2006). Plaintiffs did not produce resolutions to justify, *e.g.*, the distributions claimed on entity tax returns. Instead, they admit they do not know why some transfers were called wages and others distributions and have no record or recollection of how these decisions were made. (**Ex. A**, p. 69-70; **Ex. B**, p. 76; **Ex. C**, p. 55). With respect to loans, not only did they admit the loans shown on tax returns were not documented, they admitted they never happened. (**Ex. A**, p. 91: 7-13; 93: 8-20 (discussing Bates No. PL001030); **Ex. B**, p. 99:13-24, 113: 10-22 (discussing Bates No. 2505); **Ex. C**, p. 62:21-63:16; 69:10-15 (discussing Bates No. 0371)). Plaintiffs did not even produce a general ledger. *Auto. Fin. Corp.*, 761 F.Supp.2d at 793 (citing failure to maintain a ledger during first five months of operation).

Accordingly, the Court should pierce the entities' corporate veils and require arbitration regardless of whether Plaintiffs signed the Operating Agreement on behalf of their sham entities.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint for lack of standing, compel arbitration of any remaining claims, and, to the extent that non-arbitrable claims remain, stay them pending the arbitration of any other claims. *See G&G. Castillo*, WL 1079241, at *9.