**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRANDON ELSASSER, SETH RUBIN, and COLLINS BROWN, | ) ) ) | Case No. 17-cv-04825 |
| Plaintiffs, | ) ) | Judge Joan B. Gottschall |
| v. | ) ) | |
| DV TRADING, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2016, the Commodity Futures Trading Commission ("CFTC") assessed a $5 million monetary penalty ("the penalty") against DV Trading, LLC ("DV"), to settle allegations that its predecessors' traders engaged in prohibited wash trading of Eurodollar futures contracts between 2013–15.[1] *See* CFTC Order 2–5, 6–7, ECF No. 46-1, Ex. B (describing violations; 7 U.S.C. § 6C(a); 17 C.F.R. § 1.38(a)). Plaintiffs Brandon Elsasser, Seth Rubin, and Collins Brown traded futures for DV until August 2016. They brought this suit in their individual capacities seeking damages and a judgment declaring that they have no obligation to reimburse DV for any portion of the penalty. DV moves to dismiss three counts of the complaint for lack of standing and, alternatively, to compel DV to arbitrate any remaining claims and to stay any nonarbitrable claims. The motion requires the court to delve into the relationships among DV, each plaintiff's respective trading company, and DV's holding company, RCG Holdings, LLC ("RCG"). Each plaintiff incorporated a separate S-corporation ("trading company") when he began trading with DV.

---

[1] The record shows that DV had two predecessors in interest between 2013 and 2016: Rosenthal Global Securities, LLC ("RGS") and Rosenthal Collins Capital Markets, LLC ("RCCM"). Like the parties, the court refers to these entities as "DV." *See* Resp. to Mot. to Dismiss 2 n.1, ECF No. 46.

# I. Partial Procedural History

Plaintiffs' complaint, ECF No. 1, has four counts.  In Count I, plaintiffs seek a declaratory judgment that DV may not obtain contribution or indemnification from plaintiffs for fines imposed on DV by the CFTC.  Counts II and III arise under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25.  Both counts seek damages allegedly caused by DV's unlawful wash trading activities (Count II) and alleged fraudulent activities (Count III).  Count IV alleges that DV retaliated against plaintiffs for engaging in protected activity in violation of the CEA's whistleblower protections, 7 U.S.C. § 26.

Not counting notices of supplemental authority, the present motion marks the third round of briefing on issues similar to those now before the court.  The first came after DV received the complaint.  DV moved under §§ 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, to compel plaintiffs to arbitration under the terms of RCG's operating agreement ("the operating agreement").  ECF No. 9.  The court found that Count I likely fell within the scope of the operating agreement's arbitration clause and that the CEA, 7 U.S.C. § 26(n), made the whistleblower claim in Count IV nonarbitrable.  *Elsasser v. DV Trading, LLC*, order at 1–2 (N.D. Ill. July 31, 2018) (ECF No. 16).  The parties were given an opportunity to submit supplemental briefing because the record showed that plaintiffs had raised an important argument in related arbitration proceedings, namely that they were not bound by the operating agreement because they did not sign it in their individual capacities.[2]  *Id.* (citing Ruling on Respondents' Rule 11(b) Mot. at 6, ECF No. 15).

After receiving supplemental briefing, the court denied the motion to compel arbitration without prejudice in an opinion and order dated September 25, 2018.  2018 WL 4694364 (N.D.

---

[2] The court also found that the parties gave "short shrift" to the arbitrability analysis of Counts II and III. *Elsasser v. DV Trading, LLC*, order at 2 (N.D. Ill. July 31, 2018) (ECF No. 16).

Ill. Sept. 25, 2018), ECF No. 27. Each plaintiff produced an agreement between his individual trading company and RCG to be bound by RCG's operating agreement, which contains the arbitration clause at issue. *Id*. at *2. *See* Assignments of Interest, ECF No. 24-1, Ex. B. DV argued in the supplemental briefing (1) that the individual plaintiffs lacked standing because the claims asserted in the complaint belong to their trading companies; and (2) that the operating agreement's arbitration clause binds the plaintiffs because they "effectively pierced their own corporate veil by attempting to bring individual claims here." *Id*. (quoting Def.'s 2d Supp. Mem. 4, ECF No. 23).

The opinion and order entered September 25, 2018, resolved several issues. First, "If the plaintiffs are bound by the arbitration clause, Counts I, II and III must be arbitrated." *Id*. at *2. The court also rejected plaintiffs' argument that their claims are nonarbitrable because they severed their relationship with DV before they filed this suit. *Id*. ("The law is . . . . clear that an arbitration clause covering contractual disputes applies even when the parties' relationship which gave rise to the arbitration agreement has been terminated." *Id*. (citing *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l*, 1 F.3d 639, 642 (7th Cir. 1993)). Finally, the opinion resolved the standing argument raised in the supplemental briefing. The court ruled, "True or false, the allegations of the complaint assert that plaintiffs individually were injured and thus, at least based on the allegations of the complaint, have standing." *Id* at *3 (noting that DV has not filed a motion to dismiss the complaint for lack of standing).

The court also explained that DV bore the burden of proof on its claims that the trading companies' corporate veils should be pierced. *Elsasser*, 2018 WL 4694364 at *1 (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008)). DV did not carry its burden because its arguments were neither "well-developed . . . . [nor] supported

by evidence)."[3]  *Id.*  In denying the motion, the court explained that additional briefing or discovery might lead it to grant the motion if the court were persuaded that "(1) despite the clear allegations of the complaint, the individual plaintiffs lack standing to prosecute this suit and/or (2) even though the individual plaintiffs were not signatories to the operating agreement, they are bound by it pursuant to one of the exceptions, such as veil piercing, that under Illinois law binds non-signatories to an arbitration clause."  *Id.* at *3.

Following the September 25, 2018, ruling, the court granted DV's request for permission to conduct limited discovery on standing, estoppel, and corporate veil piercing.  Minute entry, Oct. 10, 2018, ECF No. 28.  After limited discovery closed, DV filed the pending motion and accompanying exhibits.  DV contends that plaintiffs lack standing to bring Counts II–IV and that the court should relinquish supplemental jurisdiction over the declaratory judgment claim in Count I.  Alternatively, DV seeks to compel plaintiffs to arbitrate Counts I–III under theories of estoppel and veil piercing.

## II. Motion to Dismiss

DV maintains that discovery has revealed that the plaintiffs lack Article III standing to bring the CEA claims in Counts II–IV.  U.S. Const. Art. III § 2.  Standing must be considered before reaching defendant's motion to compel because the FAA "bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute."  *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (quoting *Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 581–82 (2008)) (brackets omitted).  Standing must therefore be established before proceeding to the merits of DV's motion to compel or stay under §§ 3 and

---

[3] The court allowed supplemental briefing because the complaint "provided no clue that the plaintiffs' trading companies had agreed to be bound by the arbitration agreement or that the real parties in interests might be the trading companies and not the named plaintiffs."  *Elsasser*, 2018 WL 4694364 at *3.  Nevertheless, the record was insufficient to take the extraordinary step of piercing the corporate veil.  *Id.*

4 of the FAA. *See Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 999 (7th Cir. 2011); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 713 F. Supp. 2d 734, 743–45 (N.D. Ill. 2012).

### A. Standing Principles

To establish Article III standing, ". . . the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The complaint must contain enough factual material "to plausibly suggest" each element of standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). The Supreme Court has explained that these three requirements comprise "the irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560 (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984) (other citation omitted).

In the instant motion, DV contends that evidence produced during limited discovery proves that plaintiffs lack standing. Mem. Supp. Mot. to Dismiss 5–7, ECF No. 40. Because DV raises a factual challenge to subject matter jurisdiction (as contrasted with a facial challenge to the complaint), this court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009); *see also Lujan*, 504 U.S. at 561 (explaining that the party invoking a federal court's jurisdiction must establish standing "with the manner and degree of evidence required at the successive stages of the litigation" and cannot "rest on" the complaint's "mere allegations" at summary judgment).

The third-party standing rule frames the parties' arguments. A plaintiff may not ordinarily assert the legal rights of others. *See Kawasaki*, *supra*, 660 F.3d at 999 ("[The Supreme Court has] adhered to the rule that a party generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129, (2004))).

## B. Undisputed Facts

No party contests the relevant facts discussed in the briefing. Plaintiffs describe themselves as "traders for DV" in their complaint. Compl. ¶¶ 10, 11, ECF No. 1. "After they began working for DV, plaintiffs traded exclusively for DV until on or about August 29, 2016, when each resigned . . . ." Compl. ¶ 12. Under their trading companies' agreements with DV, DV and each plaintiff split the profits and losses on his trades, 70%-30% (trader-DV) for amounts up to $400,000, and 80%-20% for greater profits. *See* Trader Agreements, ECF No. 17-1, Ex. C. Plaintiffs traded using funds in DV's "house account;" they did not trade customer funds. *Id.* Plaintiffs were treated as employees of their trading companies for tax purposes. *Id.*

## C. Counts II and III

In Counts II and III, plaintiffs seek damages allegedly caused by wash trading in violation of § 4C of the CEA, 7 U.S.C. § 6C (Count II) and fraudulent practices in violation of § 4B, 7 U.S.C. § 6B (Count III). DV contends that plaintiffs lack standing because they were proprietary traders trading on DV's house account. Plaintiffs counter that they had a financial interest in profits and losses from their trades as shareholders and employees of their trading companies. Neither of plaintiffs' claimed interests is direct enough to establish standing on this record.

*1. Profits and Losses from Trading Activity*

The Seventh Circuit provided guidance on the third-party standing to bring private suits under § 22(a) of the CEA in *Indemnified Capital Investments., SA v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1408–10 (7th Cir. 1993), a case not discussed by the parties. The plaintiff in *Indemnified Capital* ("ICI"), contracted with the defendant, a corporation, to trade commodity futures using funds held in over 40 separate accounts. *See id.* at 1407. Most of the accounts belonged to individual ICI customers, but four were ICI "house accounts." ICI brought a private CEA suit seeking to recover damages for substantial trading losses resulting from alleged fraud. *See id.* The Seventh Circuit held that because "the losses incurred by the ICI customer accounts accrued only to ICI's customers," they were "too attenuated to create standing for ICI." *Id.* at 1409. On the other hand, ICI had Article III standing to sue for trading losses to its own house accounts. *Id.* at 1409. Regarding the customer accounts, the *ICI* court noted the absence of four things which may have established standing: ICI did not allege that it owned the funds in its customers' accounts, "that it was injured by the losses in those accounts, that it might suffer some future loss of business, or that its customers assigned their claims to ICI." *Id.* at 1409.

Here, as in *ICI*, undisputed evidence shows that DV and the trading companies, but not the plaintiffs individually, were directly injured by losses resulting from trades in DV's house account. DV points to plaintiffs' uncontested deposition testimony that DV paid all trading profits to plaintiffs' respective trading companies rather than to them personally. Plaintiffs also stipulated that the trading companies paid all relevant attorneys' fees and costs for this litigation. ECF No. 40-1, Ex. D. No one has suggested that the trading companies assigned their interests in profits and losses to plaintiffs individually. As with the customer accounts in *ICI*, the

plaintiffs here have not established that they suffered an injury in fact with regard to profits and losses in the DV house account. *See ICI*, 12 F.3d at 1409.

Plaintiffs' status as shareholders and employees of their trading companies does not give them third-party standing. Plaintiffs cite no authority in support of their argument that their indirect injuries as shareholders and employees of their trading companies confer standing. Resp. to Mot. to Dismiss 7, ECF No. 46 (citing depositions).

Plaintiffs argue that they "received less income *individually* when their trading was disrupted and when they were forced to flatten their positions in the market because the salaries and distributions the Companies could pay Plaintiffs were directly affected by the profits and losses from Plaintiffs' trading." *Id.* Plaintiffs' theory runs contrary to the shareholder-standing rule. With certain exceptions plaintiffs do not even attempt to establish, "a shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation." *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) (quoting *Rawoof*, 521 F.3d at 757).

In *Triumph Packaging Group v. Ward*, for example, the plaintiff, an employee, claimed that his employer missed its financial goals due to a racketeering scheme aimed at his employer. 877 F. Supp. 2d 629, 642 (N.D. Ill. 2012). And because the employer missed its financial goals, the plaintiff did not receive a performance bonus. *Id.* The court dismissed the suit on third-party standing grounds because "[c]ourts have recognized that employees who suffer indirect injuries as a result of conduct aimed at the employer do not have standing." *Id.* (citing *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 693 F. Supp. 666, 673 (N.D. Ill. 1988)) (collecting additional cases). The interests of the plaintiffs here, as shareholders and employees of their trading companies, are equally derivative. *See Sw. Suburban Bd. of Realtors v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987) (holding that individual plaintiff

lacked standing to bring antitrust claim for derivative injuries "in the form of reduced salary, commissions, or other employment benefits due to the corporation's weakened competitive position"). Accordingly, plaintiffs have not demonstrated that they have third-party standing to sue for profits and losses to their trading companies.

### 2. Individualized Injuries: Statutory "Actual Damages"

This court has already determined that the complaint alleges damages other than trading profits and losses. In the September 25, 2018, opinion, the court concluded that the complaint alleges injuries to the plaintiffs, other than trading losses, that satisfy the injury in fact requirement of Article III standing. *Elsasser*, 2018 WL 4694364, at *1 n.2, *2. In the complaint, plaintiffs allege they lost income because DV hired away certain of their employees in retaliation for plaintiffs' whistleblowing activities. Plaintiffs also allegedly lost income because they had to start new businesses after severing their ties with DV; and they claim they lost business because DV's actions harmed their reputations. Finally, plaintiffs allege that they lost the chance to become partners at DV as well as future partnership income. *See* Compl. ¶¶ 95, 100, ECF No. 1; *see also ICI*, 12 F.3d at 1407.

In the instant motion, DV contends that plaintiffs lack statutory, rather than Article III, standing to pursue those injuries. DV's arguments call upon the court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)) (alterations in original); *see also Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 876, 882–83 (7th Cir. 2020) (distinguishing statutory and Article III standing inquiries).

Section 22A of the CEA, 7 U.S.C. § 25, "provides the exclusive remedies to a plaintiff asserting a private cause of action for damages under the CEA." *Damato v. Hermanson*, 153 F.3d 464, 467 (7th Cir. 1998); 7 USC § 25(b)(5) (West 2020). Plaintiffs rely on § 22A(a)(1)(B) in Counts II and II. Compl. ¶¶ 92, 97. In context, that subsection reads:

(a) Actual Damages; Actionable Transactions; Exclusive Remedy

> (1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person
> . . .
> (B) who made through [the "any person" referred to above] any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;

7 U.S.C. § 25(a)(1)(B). Stated succinctly, to have standing under this subsection, the plaintiff must have "bought or sold a futures contract through the defendant." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1041 (N.D. Ill. 1995); *accord Klein & Co. Futures, Inc. v. Board of Trade of N.Y.C.,* 464 F.3d 255, 260 (2d Cir. 2005).

The "controlling question" for statutory standing is whether plaintiffs fall within the "zone of interests" protected by the provisions of the statue, here the CEA, plaintiffs invoke. *Crabtree*, 948 F.3d at 882 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). When it enacted § 22 of the CEA, Congress was concerned about "avoid[ing] suits for speculative damages to assets that are affected by fluctuations in prices on the commodity market but which are not the subject of transactions on such market." *Am. Agric. Movement Inc. v. Chicago Bd. of Trade*, 977 F.2d 1147, 1153 (7th Cir.1992) (surveying legislative history). Under the operating agreement, plaintiffs' trading companies, not plaintiffs

individually, may have been exposed to the direct financial risks of market fluctuations caused by trading in DV's house account. While plaintiffs' interests as shareholders and employees of their trading companies may have been affected by market fluctuations, neither interest was the subject of a commodity market transaction. Plaintiffs did not, of course, trade their shares (which are securities, not futures) in their trading companies.

Plaintiffs attempt to show that they have statutory standing by analogizing their roles to that of an introducing broker, citing *Fintec Group, Inc. v. U.S. Bank, N.A.*, 2014 WL 4784141, at 7 (N.D. Ill. Sept. 25, 2014). "Introducing brokers are those engaged in soliciting or accepting orders for the purchase or sale of commodities. They do 'not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.'" *Id*. at *1 (citations omitted). On the facts alleged in the complaint in *FinTec*, Judge Ellis held that the introducing broker plaintiff had standing under § 22(a) of the CEA because the plaintiff may have placed orders on behalf of its customers through a futures commission merchant. *See id*. at *1–2, *7 (alternative holding; citing *Sundial In'tl Fund Limited v. Delta Consultants, Inc.*, 923 F. Supp. 38, 40–41 (S.D.N.Y. 1996)).

The analogy to an introducing broker does not persuade. Plaintiffs did not use a future commissions merchant, or anyone else, to place trades on DV's house account on behalf of customers. They placed the trades themselves as employees of their trading companies. If anything, this suit more closely resembles a suit by employees of an introducing broker for CEA violations perpetrated by their employer. Plaintiffs cite no authority for the remarkable proposition that an employee or shareholder has standing under § 22(a) of the CEA merely because the company does.

The court finds the Second Circuit's decision in *Klein & Co.*, *supra*, to be considerably more on point than *FinTec*. The plaintiff in *Klein & Co.* was a futures commission merchant that effectively extended credit to its clients and "facilitated the trading and fulfilled certain obligations of its customers who traded through the [Board of Trade of the City of New York]." 464 F.3d at 257. The suit alleged that another trader manipulated certain futures contracts, causing Klein to miscalculate the margin requirements for a customer's account. *Id.* at 258. The manipulation allegedly set in motion a series of events that led to the plaintiff's inability to cover some of its customer's losses and through a further chain of causation to the suspension of the plaintiff's exchange memberships and its financial collapse. *See id.* The Second Circuit held that the plaintiff lacked standing under § 22(a) of the CEA because it did not purchase or trade the futures contracts at issue but rather its client did, "had nothing to do with its trading decisions," and "had no interest in any of the resulting profits or investments losses." *Id.* at 262.

The plaintiffs here argue that, unlike the plaintiff in *Klein*, they actually traded futures contracts and had a financial stake in those trades. But again, by their own admission, plaintiffs held an indirect stake in the trades as employees and shareholders of their trading companies. Resp. to Mot. to Dismiss 9, ECF No. 46. The court has already concluded that plaintiffs have not shown that they have third-party standing as employees or shareholders of their trading companies.

Here, as in *Klein*, substantial, even devastating, financial harms allegedly flowed to the plaintiffs from the CEA violations alleged in Counts II and III. The text of § 22(a) of the CEA nevertheless limits plaintiffs' standing.[4] See *Klein*, 464 F.3d at 262–63; *DGM Investments, Inc. v. New York Futures Exchange, Inc.*, 288 F. Supp. 2d 519, 526 (S.D.N.Y. 2003) ("plaintiffs

---

[4] The court implies no view on whether the trading companies would have standing under § 22(a) of the CEA.

under § 4b must be persons defrauded in connection with a futures transaction conducted on their behalf, not simply any person defrauded in connection with a futures contract" (quotation omitted)); *cf. Davidson v. Belcor, Inc.*, 933 F.2d 603, 606–07 (7th Cir. 1991) (holding, in private suit to enforce securities laws, that wife lacked standing because she held only a "passive" interest in the proceeds of a merger transaction). Accordingly, plaintiffs lack statutory standing to bring Counts II and III.

**D. Whistleblower Claim (Count IV).**

In Count IV, plaintiffs bring a claim under § 23(h)(1) of the CEA, the whistleblower anti-retaliation provision. 7 USC § 26(h) (West 2020); *see also* 17 C.F.R. § 165.20(a) (2017). Under the anti-retaliation provision, "No employer may discharge, demote, suspend, directly or indirectly threaten or harass, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the Commission . . . [or] in assisting in any investigation or judicial or administrative action of the Commission." 7 U.S.C. § 26(h)(1)(A)(i–ii) (West 2020). Plaintiffs plead that DV pressured them not to cooperate with the CFTC's wash trading investigation "by threatening legal action against them and by seeking to have Plaintiffs pay for the $5,000,000 fine imposed on DV." Compl. ¶ 103, ECF No. 1.

DV makes two arguments for dismissing Count IV for lack of standing. *See* Mem. Supp. Mot. to Dismiss. 7–8, ECF No. 40. First, DV contends that plaintiffs' trading companies were their employers for § 23(h)(1) purposes, citing plaintiffs' admissions that their trading companies paid them and treated them as employees for tax purposes. Plaintiffs respond that their respective trading companies and DV were joint employers, pointing to the trading agreement each plaintiff signed with DV. *See* Trading Agreements, ECF No. 44. The trading agreements

do not say in so many words whether they create an employer-employee relationship, though they do require each trader to trade exclusively for DV. *E.g.*, ECF No. 46-1, Ex. A at 1. Second, DV argues that all of the alleged retaliation occurred after plaintiffs resigned, and § 26(h)(1) does not reach post-termination retaliation. Def.'s Reply in Supp. of Mot. to Dismiss 8-9, ECF No. 47.

The parties do not discuss whether either issue DV has raised is properly categorized as a jurisdictional standing question or a merits issue. DV appears to concede that at least its second argument is a merits issue by citing cases applying the Federal Rule of Civil Procedure 12(b)(6) standard instead of Rule 12(b)(1), which covers motions to dismiss for lack of subject matter jurisdiction. *See* Reply 9–10, ECF No. 47. (citing *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016)). The Supreme Court has in recent years "pressed a stricter distinction between truly jurisdictional rules, which govern 'a court's adjudicatory authority,' and non-jurisdictional 'claim-processing rules,' which do not." *Ortiz-Santiago v. Barr*, 924 F.3d 956, 962–63 (7th Cir. 2019) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)) (other citations omitted). Courts typically treat questions similar to those DV raises here as merits questions amenable to analysis on a Rule 12(b)(6) motion or at summary judgment. *See generally Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 810–12 (7th Cir. 2014) (analyzing summary judgment decision on joint employment under the Americans with Disabilities Act and discussing joint employment principles); *Potts v. Ctr. for Excellence in Higher Educ., Inc.,* 908 F.3d 610, 618 (10th Cir. 2018) (affirming dismissal of claim under the False Claims Act on Rule 12(b)(6) motion because the plaintiff alleged pre-resignation retaliatory conduct). In the absence of any specific argument or authority showing that DV's attacks on Count IV raise truly jurisdictional standing issues, the court treats them as merits issues and analyzes them under the Rule 12(b)(6) standard. *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (setting forth procedural principles); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2005).

DV's first issue–joint employment–has not been adequately briefed. The issue is important, for it has the potential to greatly expand or limit the scope of the CEA's whistleblower protections. DV cites a regulation mirroring the text of § 23(h)(1). *See* Reply 10, ECF No. 47; 7 U.S.C. § 26(h)(1); 17 C.F.R. § 165.2(o)(1). But no party cites legal authority interpreting § 23 of the CEA. No party attempts an analysis of the statute's text. No party suggests an analogous statute. The court declines to attempt to fashion arguments for the parties or conduct their legal research for them.

Many of the alleged retaliatory acts in the complaint occurred after plaintiffs resigned from DV. The complaint lists retaliatory acts under the heading "Retaliatory Acts;" all but one occurred after plaintiffs resigned on August 29, 2016. *See* Compl. ¶¶ 74–81 (describing, among other things, post-resignation arbitration and litigation conduct). Plaintiffs point to paragraph 103 of the complaint, but it lists the elements of their claims in conclusory fashion without specifying when the alleged retaliatory acts occurred. *See* Compl. ¶ 103. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, *supra*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2005)).

Nevertheless, the complaint, when viewed in a light favorable to plaintiffs, identifies at least one act of retaliation occurring prior to plaintiffs' resignations. In paragraphs 68–70, plaintiffs allege that their conversations with two DV partners in the two years leading up to their resignations led plaintiffs to believe that they would be offered partnership in a new entity to be

"spun off" from DV. Comp. ¶ 68. Though DV argues that no specific dates are given, the complaint is clear that the conversations occurred prior to plaintiffs' resignations. *See* Compl. ¶ 68. The DV partners also allegedly pressured plaintiffs. Compl. ¶¶ 69–70. They told plaintiffs they wanted them to pay some portion of the penalty; with favorable inferences, making partner required each plaintiff to agree to pay a portion of the penalty. Compl. ¶ 69. Plaintiffs allege that they decided to leave DV instead of succumbing to this pressure. *Id*. ¶ 70. With favorable inferences, this pressure resulted in plaintiff's alleged "constructive discharge." *See* ECF No. 47 at 10; *Iqbal*, 556 U.S. at 679 (allegations must be assumed true on Fed. R. Civ. P. 12(b)(6) motion).

In reply, DV argues that the conversations in paragraphs 68–70 do not, as a matter of law, rise to the level of actionable constructive discharge. ECF No. 47 at 10. But DV waived this argument by raising it for the first time in its reply. *E.g.*, *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011) ("[I]it is well established that arguments raised for the first time in a reply brief are waived." (citing *Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011))). Accordingly, DV's motion to dismiss Count IV is denied.

### E. Count I (Declaratory Judgment Claim)

DV's argument for dismissal of the state law claim in Count I presupposes the dismissal of Counts II–IV. DV notes that this court has supplemental jurisdiction over Count I and urges the court to exercise its discretion to dismiss Count I because all claims arising under federal law have been dropped from the case. *See* 28 USC § 1367(c)(3) (permitting the court to relinquish supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction"). Since Count IV has not been dismissed, the request to dismiss Count I must be, and is, denied.

### III. Motion to Compel Arbitration

Since shortly after this case's inception, DV has been attempting to enforce an arbitration clause in RCG's operating agreement. Each plaintiff signed an agreement to be bound by the operating agreement in his capacity as an officer of his trading company. This court has determined that, if it binds the plaintiffs, the arbitration clause reaches the declaratory judgment claim in Count I but not the whistleblower retaliation claim in Count IV. *Elsasser v. DV Trading, LLC*, No. 17-CV-4825, order at 1–2 (N.D. Ill. July 31, 2018). As explained by the court, "The subject of the Operating Agreement encompasses membership in RCG Holdings, the rights and duties of members, the establishment of trading accounts, and members' capital contributions." *Id*.

To this point, DV has attempted to persuade the court that plaintiffs' interests are separate from those of their trading companies for standing purposes. Plaintiffs have generally taken the contrary position. The two sides effectively switch on the motion to compel arbitration. DV seeks in effect to show that the separation between each plaintiff and his trading company should be disregarded under Illinois contract law principles. Plaintiffs resist.

Under ordinary contract law principles, "an arbitration agreement generally cannot bind a non-signatory." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1059 (7th Cir. 2018) (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)). The applicable state contract law determines what "limited exceptions" the signatory rule has. *Id*. (citing *Zurich Am. Ins.*, 417 F.3d at 687). The parties apply Illinois law here.

DV invokes two recognized exceptions to the signatory rule: direct benefits estoppel and corporate veil piercing. *See id*. at 1059–60 (listing exceptions). The court finds the doctrine of estoppel applicable and does not reach veil piercing.

**A. Estoppel**

"Estoppel is an equitable doctrine that prevents a non-signatory 'from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause.'" *Id*. at 1064 (quoting *Zurich Am. Ins*. 417 F.3d at 661) (internal quotations removed). The parties debate the scope of the estoppel inquiry. Plaintiffs urge a narrow focus on whether they seek a direct benefit in this litigation, as contrasted with their dealings with DV generally. Plaintiffs emphasize language like the following in decisions of district courts: "The touchstone of this form of estoppel . . . is whether the non-signatory has brought suit against the signatory premised upon the agreement that contains the arbitration clause at issue, thus seeking the agreement's direct benefits." *Transatlantic Reins. Co. v. Nat'l Indem. Co.*, 2014 WL 2862280, at *4 (N.D. Ill. June 24, 2014) (quoting *Gersten v. Intrinsic Technologies, LLP*, 442 F. Supp.2d 573, 579 (N.D. Ill. 2006)); *see* Resp. 15–16.

The Seventh Circuit's decision in *A.D.* shows that direct benefits can flow in at least two ways. First, a party can benefit directly by seeking to sue on the arbitration clause even if they are not a signatory. Second, under certain circumstances, the party may seek to benefit from the agreement containing the arbitration clause. *A.D.*, 885 F.3d at 1054-55.

DV contends that the plaintiffs benefited directly under the operating agreement by trading under DV's name and by receiving their salaries, and other expenses, from profits paid to their trading companies. *See* Mot. to Dismiss 9. The court disagrees. In short, those benefits were indirect. They flowed downstream from the operating agreement to the trading companies and then to each plaintiff. *See A.D.,* 885 F.3d at 1064 (purchase was indirect benefit of credit card agreement because purchase was made at the direction of the card holder); *Zurich*, 417 F.3d at 688 ("A corporate relationship is generally not enough to bind a nonsignatory to an arbitration

agreement" (citing *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir.1995)). DV also argues that plaintiffs obtained good will from trading on DV's name, but it cites no evidence. Mem. Supp. Mot. to Dismiss 9, ECF No. 40.

DV also contends that plaintiffs have received a benefit from the operating agreement in that Count I, seeking to spare them from imposition of the CFTC fine, requires a court to construe the operating agreement. This argument is rejected. Count I does not trigger direct benefits estoppel. The declaratory judgment device used in Count I anticipates a potential claim for indemnification or contribution by DV against the plaintiffs. *See* Compl. ¶ 87.

In the hypothetical claim Count I anticipates, DV would contend that the operating agreement's language requires plaintiffs to reimburse it for the penalty, and plaintiffs would respond by offering their preferred construction of the operating agreement. If DV were to file such a hypothetical suit, plaintiffs' defensive move asking the court to determine the operating agreement's meaning would not trigger direct benefits estoppel. *See A.D.*, 881 F.3d at 1064–65 (holding possible defense could not justify applying estoppel). Because the declaratory judgment claim in Count I is effectively a mirror image of DV's hypothetical lawsuit, Count I cannot justify direct benefits estoppel either. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 135 (2007) (explaining that the plaintiff was "not repudiating or impugning the contract while continuing to reap its benefits" by bringing a declaratory judgment suit to settle a licensing dispute).

On the other hand, the CEA claims in Counts II and III seek direct benefits conferred by the operating agreement. As DV notes, plaintiffs seek damages for lost profits in Counts II and III that should have flowed to their trading companies, if at all, through the operating agreement. Plaintiffs want it both ways. They want to avoid the arbitration clause in the operating

agreement. But in Counts II and III, they want a judgment that DV must pay them personally the profits they claim would have, under the operating agreement, been payable to their trading companies. Although this court has found that plaintiffs lack statutory standing to pursue Counts II and III, those claims may still be considered when applying estoppel.

If their briefing is read generously, plaintiffs argue that the damages they plead in Counts II and III are at most indirect benefits of the operating agreement because plaintiffs are shareholders, and employees, of their trading companies. See Resp. 16–17. But direct benefits estoppel applies where an ownership interest in a company is properly deemed a direct benefit of a contract containing an arbitration clause. See *Everett*, 771 F.3d at 385. In *Everett*, the Seventh Circuit held that the individual plaintiff, a shareholder in a company called EAGB, could not avoid an arbitration clause in EAGB's franchise agreement with the defendant, the *Everett* court *reasoning* that "[w]ithout the franchise agreement EAGB and the business it operated would not have existed, and thus [the plaintiff's] Everett's ownership interest would not have existed." *Everett*, 771 F.3d at 385; *see also Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000)); cf. *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991) (applying similar principles to veil piercing). The record here reveals that the plaintiffs' interests as shareholders in their trading companies would not exist without the operating agreement.

Each plaintiff testified that the trading companies would not exist but for the operating agreement, and each trading company was created for a single purpose: to facilitate the trading relationship between DV and the plaintiff. *See* Elsasser Dep. 14:13–24, 102:16–103:11, ECF No. 40-1, Ex. A; Brown Dep. 106:11–107:11, *id*. Ex. B; Rubin Dep. 73:15–22, *id*. Ex. C.

Plaintiffs therefore seek to benefit directly from the operating agreement in Counts II and III, and, like the plaintiff in *Everett*, they are estopped from avoiding the arbitration clause.

### B. Staying Count IV

Because Count IV is nonarbitrable, the court must decide whether to stay it while the parties arbitrate Count I.

DV requests a stay in its opening motion, briefly citing this court's decision in *G&G Closed Circuit Events v. Castillo*, 2017 WL 1079241, at *9 (N.D. Ill. Mar. 22, 2017). Mem. Supp. Mot. to Stay 8, ECF No. 10. Plaintiffs' only response comes in a footnote noting that a stay is not mandatory. Resp. at 15 n.3, ECF No. 46.

Plaintiffs correctly state the general rule. "The decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket." *G&G*, 2017 WL 1079241, at *9 (quoting *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007)) (collecting additional authority). An abuse of that discretion can occur "when 'allowing nonarbitrable issues to proceed in the district court, risks inconsistent rulings because the pending arbitration is likely to resolve issues material to [the] lawsuit.'" *Id.* (quoting *Volkswagen*, 474 F.3d at 972) (internal quotations omitted).

The parties' briefs do not explore in any depth the potential for overlap between this suit and the arbitration. *See id.* at *10. However, it seems plain enough that the facts alleged in plaintiffs' whistleblower retaliation claim run a substantial risk of overlapping with facts and issues likely to arise in the arbitration of plaintiffs' declaratory judgment claim. Without a stay, the facts surrounding the CFTC's investigation of DV as well as the interactions between plaintiffs and DV's principals will almost certainly be at issue both in this court and in arbitration proceedings. The court therefore stays Count IV pending arbitration. *See id.* (staying claims

after finding that "[a] substantial risk of inconsistent rulings on a factual question central to the dispute . . . exists").

## IV. Conclusion

For the reasons stated, DV's motion to dismiss for lack of standing or alternatively to compel arbitration is granted in part and denied in part. Counts II and III are dismissed for lack of standing. The motion to dismiss is denied in all other respects. The motion to compel arbitration of Count I is granted, and Count IV is stayed pending the arbitration.


Dated:  March 16, 2020                    _____/s/_____
                                          Joan B. Gottschall
                                          United States District Judge